97 N.J. Super. 116 (1967)
234 A.2d 503
MAYFAIR FABRICS, PLAINTIFF,
v.
HENRY HENLEY, ET AL., DEFENDANTS.
WILLIAM B. NATELL, PLAINTIFF,
v.
HENRY HENLEY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided September 21, 1967.
*118 Mr. Robert F. Colquhoun for plaintiff William B. Natell.
Mr. H. Curtis Meanor for defendant William B. Natell (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
Mr. Allan Maitlan for Mayfair Fabrics (Messrs. Feuerstein & Sachs, attorneys; Messrs. Glickman & Valentine and Mr. Peter S. Valentine, of counsel).
ACKERMAN, J.S.C.
This matter is before the court on cross-motions for partial summary judgment made by William *119 and Jean Natell, the owners and landlords of a commercial building located in Clifton, New Jersey, and by Mayfair Fabrics, Inc., the sole tenant of the building, and deals with the interpretation and effect of an exculpatory clause and provision for insurance in the lease between the parties. It is the sequel to the decision in Mayfair Fabrics v. Henley, 48 N.J. 483 (1967), which dealt with the construction of the same exculpatory clause.
The lease in question was for a five-year term and the annual rental was $10,000. It was entered into on April 15, 1963, and both parties had the benefit of advice of legal counsel in connection with the preparation and signing of the lease. Paragraph 28, a typewritten rider attached to the printed form of the lease, provided as follows:
"It is mutually agreed that the landlords will insure the building against fire and the tenant agrees to carry fire insurance upon all equipment and personal property used, placed or stored in, on or near, the leased premises and in no event shall the landlord be responsible or liable for loss or damage to the tenant's property by fire, explosion or otherwise. In the event that the hazards of the tenant's business makes it impossible for landlords to obtain fire insurance at standard rates covering the said building then this lease shall at the option of the landlord be null and void."
When the building was originally erected, heat was provided by three space heaters hung from the ceiling of the premises. The tenant, which was engaged in the business of knitting and manufacturing cloth products, desired to install an overhead traveling crane to lift materials to and from the knitting machines. By paragraph 27 of the lease, the landlords agreed to relocate the space heaters in order that the crane might be installed. Before the tenant took possession under the lease in May 1963 the landlords, in compliance with the provision in the lease, caused two of the heaters to be removed from their existing locations and stored for the summer. In August 1963 the tenant reminded the landlords that the heating units would have to be reinstalled in their new locations before the onset of cold *120 weather, and the landlords engaged Henley, who did heating installation and service work, to perform this task. Henley commenced the reinstallation on August 7 with the aid of Natell, who helped primarily in the installing of jacks on the roof for the smoke stacks of the heaters and the roof patching in connection therewith. The work was not completed by Friday afternoon, August 9, 1963, when Natell and Henley left the premises. Early in the morning on August 10, while the tenant's factory operations were in progress with Jensen, an employee of the tenant, at work in the premises, a disastrous fire occurred which caused considerable damage to the landlords' building and to the tenant's property therein. The cause of the fire and the responsibility therefor are in dispute.
In accordance with their undertakings in paragraph 28 of the lease, both the landlords and the tenant had secured fire insurance. After the fire the landlords were paid $33,178.20 by their fire insurance carrier for damage to the building, and the tenant received $179,333.51 from seven insurance companies which had covered its property at the premises against loss by fire.
Late in 1963 two actions were commenced in this court which were subsequently consolidated. In the first action the landlords sued the tenant, among others, to recover for fire damage to the building, asserting that the fire resulted from the tenant's negligence. Damages sought to be recovered as set forth in the pretrial order were $33,178.20, the amount received by the landlords on their fire insurance, plus any rentals which might be due to the landlords and lost as the result of the fire. The second action was instituted by the tenant against Natell, the landlord, among others, claiming that the fire and the damage suffered by the tenant were caused by his negligence or faulty workmanship in connection with the removal and relocation of the heaters. Damages sought were $179,333.51, the amount recovered by the tenant on its fire insurance, plus the sum of $11,155.75 claimed as out-of-pocket losses not reimbursed by insurance *121 payments, plus a lost profit claim of $60,728.83. The total damages sought by the tenant therefore amounted to approximately $251,200.
The landlords, defending the action brought by the tenant, set up as an affirmative defense, among others, that the exculpatory clause provided for in paragraph 28 relieved them from liability to the tenant. They moved for summary judgment thereon, and in support thereof filed an affidavit by William Natell to the effect that they were being defended by Utica Mutual Insurance Company on a liability policy which contained a $50,000 property damage limit for each accident. The affidavit stated that Natell had relied upon the validity of the exculpatory clause in determining that the property damage liability limit in the policy was satisfactory for his needs, and further stated that he considered the $50,000 limit in the liability policy to be adequate to cover any potential liabilities to "others aside from Mayfair Fabrics."
The trial court denied the motion for summary judgment, holding that there was a factual issue as to whether the loss suffered by the tenant resulted from activity encompassed by the landlord-tenant relationship or was the result of acts of Natell performed in a capacity other than as landlord. Relying upon the decision in W.F. Zimmerman v. Dagett & Ramsdell, Inc., 34 N.J. Super. 81 (Law Div. 1955), the court held that if the acts of Natell were not performed in his capacity as landlord, the exculpatory clause in the lease would not be applicable to release Natell from liability, and it therefore concluded that there was a factual issue which required a plenary trial.
Upon appeal the Supreme Court reversed in Mayfair Fabrics, supra, holding that it was clear, that the activity of Natell, upon which the tenant's claim against the landlords was founded, was in his capacity as landlord and not otherwise, and further holding that the exculpatory clause in paragraph 28 was valid and not violative of any public policy in this State. Noting that the lease was a commercial lease *122 and that the terms had been negotiated with the aid of counsel, the court ruled that the parties were not in unequal bargaining positions and that the clause was a valid private contractual arrangement between the parties providing for mutual reciprocal obligations to insure their respective properties against damage by fire and distributing the risks of loss between them. The court concluded that the clause relieved the landlords of liability to the tenant for its direct property damage, but declined to pass upon the question whether the tenant's claim for loss of business profits was barred by the clause, saying:
"The exculpatory clause, after providing that the tenant would carry fire insurance `upon all equipment and personal property used, placed or stored in' the leased premises, set forth that in no event would the landlord be responsible for fire damage `to the tenant's property.' Question has been raised by some members of the court as to whether, in the light of the quoted language, it may properly be said that the agreement of the parties contemplated a bar sufficiently comprehensive to include that part of the plaintiff's complaint which seeks damages for loss of prospective `business profits.' Cf. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 314 (1954); Henry Clay v. City of Jersey City, 74 N.J. Super. 490, 498 (Ch. Div. 1962), affirmed 84 N.J. Super. 9 (App. Div. 1964), certif. denied 43 N.J. 264 (1964). Since that question has not been briefed or argued, we do not pass on it and the plaintiff remains free to pursue it before the trial court." (48 N.J., at p. 490)
Upon remand, the two motions for summary judgment now before the court were filed. The landlords move for summary judgment that paragraph 28 bars the tenant's suit against them for loss of business profits. The tenant moves for summary judgment that the landlords are barred by the provisions of the same paragraph from suing the tenant for the property damage to the building caused by the fire.

I
With respect to the tenant's motion, it is of course apparent that, although there is express language in paragraph 28 relieving the landlords from liability to the tenant, there *123 is no corresponding language which clearly and explicitly relieves the tenant from liability to the landlords for damage to their property. It is the court's conclusion that the clause nevertheless has that effect.
The rule generally enunciated with respect to the construction and interpretation of exculpatory clauses and provisions allocating the risk of loss between landlord and tenant, which normally favor the landlord, is that they are closely scanned and given a strict construction against the landlord, who usually has the superior bargaining position. Kuzmiak v. Brookchester, 33 N.J. Super. 575 (App. Div. 1955); Freddi-Gail v. Royal Holding Co., 34 N.J. Super. 142 (App. Div. 1955); Bauer v. 141-149 Cedar Lane Holding Co., 42 N.J. Super. 110 (App. Div. 1956), affirmed 24 N.J. 139 (1957). It is also settled that, if possible without doing violence to the plain meaning of the language used, a court will endeavor to give a construction to a contract which is most equitable to both parties and which will not give to one party an unfair or unreasonable advantage over the other. Washington Construction Co. Inc., v. Spinella, 8 N.J. 212 (1951); Tessmar v. Grosner, 23 N.J. 193 (1957).
These rules favor the construction contended for by the tenant, who urges that the clause in question grants to both parties equal immunities from liability which are mutual and reciprocal. It is not necessary, however, to decide this motion on the basis of any rules of strict construction in favor of one party against the other. Here we have a commercial lease entered into between businessmen. In plain and unmistakable language they mutually agreed that each would insure his own property against loss by fire at his own expense. Their agreement should be construed to accord with the understanding of reasonable businessmen, see Mortgage Co. of New Jersey v. Manhattan Savings Bank, 71 N.J. Super. 489, 497 (Law Div. 1962), and in harmony with the modern judicial view that provisions in leases and other commercial agreements such as that here involved, *124 whether couched in language of indemnity or exculpation or imposing obligations with respect to obtaining insurance, are to be viewed realistically as normal, common-sense efforts by businessmen to allocate between them the cost or expense of risks of property damage. They contemplate that such risks will be covered by insurance, and the only practical feature of such bargains ordinarily is the decision as to who is to bear the cost of insurance. Buscaglia v. Owens-Corning Fiberglas, 68 N.J. Super. 508 (App. Div. 1961), affirmed 36 N.J. 532 (1962); Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117 (App. Div. 1960); Midland Carpet Corp. v. Franklin Assoc. Properties, 90 N.J. Super. 42 (App. Div. 1966).
Applying these rules, the sensible and reasonable construction of paragraph 28 is that each of the parties to the lease undertook at his own expense to secure adequate insurance against loss to his property from fire and, as between them, agreed to look to that insurance alone to recoup any loss and to relieve the other from liability for such loss even though caused by negligence, regardless of whether that liability should be asserted by the party for his own benefit or by his insurer seeking to enforce subrogation rights. It is immaterial that there was no express exculpatory clause in favor of the tenant. Although the landlords argue that the fact that an exculpatory clause was inserted in favor of the landlords, whereas none was inserted for the tenant, indicates that exculpation of the tenant was not intended, to so hold would render the agreement as to insurance meaningless as a practical matter, and it is equally arguable that the express exculpatory clause in favor of the landlords, to the extent that it relates to fire damage, was unnecessary and was inserted out of an abundance of caution.
The decision of the Supreme Court in Mayfair Fabrics, supra. clearly supports this construction. Although the court there was viewing matters from the landlords' end and gave effect to the express exculpatory clause in their favor, *125 it is clear that full effect was also given to the mutual agreement to insure. Referring with approval to the decision in Midland Carpet Corp. v. Franklin Assoc. Properties, supra, the court ruled:
"As in Midland, the parties here were not in unequal bargaining positions. They deliberately distributed the risks and designated who was to obtain the necessary insurance. The commercial tenant had full legal representation and the typewritten rider, which included several provisions for the tenant's benefit, evidenced the actual bargaining between the parties. Paragraph 28 was patently designed to place responsibility for fire damage to the tenant's property entirely on the tenant who was to carry fire insurance thereon. The responsibility for the building was that of the landlords who were to insure it against loss by fire, with a privilege to declare the lease void if they could not obtain fire insurance at standard rates because of the hazards of the tenant's business. The distribution of the risks entailed no elements of injustice and did not conflict with the public interest. It was a private contractual arrangement fairly and freely entered into and which the common law would sympathetically carry out in accordance with the contemplation of the parties." (48 N.J., at p. 488)
This result is also supported by decisions in other jurisdictions which hold that mutual agreements to insure, contained in leases and other commercial agreements similar to that here involved, will be realistically construed to provide mutual exculpation to the bargaining parties, who are deemed to have agreed to look solely to their insurance and to have relieved each other from liability. General Mills, Inc. v. Goldman, 184 F.2d 359 (8 Cir. 1951), certiorari denied 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951); Cerny-Pickas & Co. v. C.R. Jahn Co., 7 Ill.2d 393, 131 N.E.2d 100 (Sup. Ct. 1955); Rock Springs Realty Inc v. Waid, 392 S.W.2d 270, 15 A.L.R.3d 774 (Mo. Sup. Ct. 1965); see Fry v. Jordan Auto Company, 224 Miss. 445, 80 So.2d 53, 58 (Sup. Ct. 1955); Fred A. Chapin Lumber Company v. Lumber Bargains, Inc., 189 Cal. App.2d 613, 11 Cal. Rptr. 634 (D. Ct. App. 1961), and see Buckey v. Indianhead Truck Lines, 234 Minn. 379, 48 N.W.2d 534, 539 (Sup. Ct. 1951); Monsanto Chemical Co. v. *126 American Bitumuls Co., 249 S.W.2d 428 (Mo. Sup. Ct. 1952); Newport News Shipbuilding & Dry Dock Co. v. United States, 34 F.2d 100 (4 Cir. 1929); United States Fire Insurance Co. v. Phil-Mar Corp., 166 Ohio St. 85, 139 N.E.2d 330 (Sup. Ct. 1956); Waterway Terminals Co. v. P.S. Lord Mechanical Contractors, 242 Or. 1, 406 P.2d 556, 565, 13 A.L.R.3d 1 (Sup. Ct. 1965).
As heretofore noted, the landlords did procure fire insurance in accordance with their agreement in the lease and have been paid for the damage to the building by their insurance carrier. The action against the tenant is clearly a subrogation action being prosecuted for the sole benefit of the fire insurance company. Although the right of an insurance company to enforce subrogation rights in appropriate cases has long been well settled, it is also clear that subrogation is not applicable when its enforcement would be inconsistent with the terms of a contract or where the contract, either expressly or by implication, forbids its application. Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162 (1954); Ganger v. Moffett, 8 N.J. 73 (1951). There is no claim here that the granting of exculpation by the landlords to the tenant violated any rights of the landlords' fire insurance carrier, and the New Jersey standard fire policy permits an insured to waive rights of recovery against any party before loss. It is obvious that most arrangements between landlords and tenants, which involve distribution of risks of loss between them by procuring insurance, of necessity involve the release or waiver of subrogation rights as well as direct rights, and this is recognized in the industry and among businessmen. This is reflected not only in the decisions cited above but also in the pertinent trade and legal publications which deal with the problems of drafting effective indemnity, exculpatory and insurance clauses, and suggest methods of procuring insurance by landlords and tenants so as to economically allocate risks of loss between them and avoid subrogation exposure. See, for example, Berry, "Some Aspects of Subrogation", *127 Management Bulletin No. 48, p. 26, American Management Association, Insurance Division (1964); "Fire Legal Liability Insurance", 359 Insur. L.J. 786 (Dec. 1952); Friedman, "Landlords, Tenants and Fires," Best's Fire and Casualty News (June 1958); Kimball and Davis, "The Extension of Insurance Subrogation," 60 Mich. L. Rev. 841 (1962); "Fire Legal Liability Insurance," Fire, Casualty and Surety Bulletin (National Underwriters Company, Casualty and Surety Section,) Multiple Line FL-1 (1950); see 16 N.J. Practice (Lodge, Legal Business Forms) (2nd. ed. 1965), § 2369 et seq.
If, in spite of the reciprocal insurance obligations undertaken by the parties in paragraph 28, it is concluded that the tenant is not released from liability to the landlords, it is clear that such retention of liability would be for the sole benefit of the landlords' insurance carrier. In addition to paying for its own fire insurance on its own property, the tenant would have to bear the cost of fire damage to the landlords' building caused by its negligence by paying for it from its own pocket or by expending funds for additional insurance, such as fire legal liability insurance. By the same token the landlords, in the absence of an express exculpatory clause, would not only have the expense of providing fire insurance on their building, but would also have to secure adequate liability insurance or be self-insurers so far as claims of the tenant are concerned. Neither the landlords nor the tenant would gain any individual advantage or benefit by imposing such additional expenditures upon the other. In the circumstances of this case, if the provisions of paragraph 28 are to be construed realistically as a reasonable business arrangement to provide each party with adequate insurance against loss by fire, but without imposing additional or unnecessary financial burdens upon the other, the conclusion that mutual and reciprocal immunities from liability were intended and provided for is clearly warranted.
*128 The other provisions of the lease do not militate against this construction. The landlords contend that the provisions of paragraph 35 of the rider to the lease which requires the tenant at its cost and expense to carry "public liability insurance" in stated amounts to cover any "accident, occurrence or damage in the demised premises or in any other portions of the building, or lands controlled by the tenant," show that it was not intended that the tenant should be released from liability to the landlords for fire damage caused by its negligence. This is not so. The requirement of public liability insurance was obviously imposed for reasons other than to satisfy liability to the landlords or their subrogated insurer for property damage to the building, and the normal exceptions in such policies, such as those excluding coverage for damage to property in the care, custody, control or possession of the insured, would exclude such coverage. The requirement for public liability insurance did not obligate the tenant to procure fire legal liability insurance. See Bernstein v. Palmer Chev. etc. Inc. v. Rex Sales Co., Inc., 86 N.J. Super. 117 (App. Div. 1965); Elcar Mobile Homes, Inc. v. D.K. Baxter, Inc., 66 N.J. Super. 478 (App. Div. 1961); Fred A. Chapin Lumber Company v. Lumber Bargains, Inc., supra; and see the secondary authorities cited above.
It is therefore concluded that the tenant is relieved by the terms of the lease from liability to the landlords for fire damage to the building, even though caused by its negligence, and, accordingly, the tenant's motion for summary judgment is granted.

II
The landlords contend that they are exculpated by the provisions of paragraph 28 from liability to the tenant for indirect loss or damage by fire to the tenant's personal property, as well as for direct loss or damage to such property, and that they are therefore not liable to the tenant for its loss of business profits.
*129 The express exculpatory clause in paragraph 28 relieves the landlords from liability for loss or damage to the tenant's "property" by fire. The Supreme Court held in Mayfair Fabrics, supra, that the landlords are relieved of liability for direct or physical damage to the tenant's property. The loss of profits allegedly sustained by the tenant is a consequential or indirect loss arising from such damage and was caused by the same alleged negligence which caused the direct damage to the property. The tenant's rights to the use of its property and to the profits therefrom are property rights, and its right to recover damages for their impairment is an element of the damages recoverable because of the direct damage to its property. See Rempfer v. Deerfield Packing Corp., 4 N.J. 135 (1950); Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295 (1954); Henry Clay v. City of Jersey City, 74 N.J. Super. 490 (Ch. Div. 1962), affirmed 84 N.J. Super. 9 (App. Div. 1964), certification denied 43 N.J. 264 (1964); 4 Restatement, Torts, § 928, p. 658 (1939). There is conventional insurance which the tenant carried, or could have carried, to cover itself for loss of business profits. Such business interruption or use and occupancy insurance is classified as a form of "property insurance" and as a form of "fire insurance" covering indirect loss or damage to property caused by fire. See 11 Couch on Insurance (2nd ed. 1963), §§ 42:401 et seq.; 5 Appleman, Insurance Law and Practice, §§ 3120, 3121 (1941); Gordis, Property and Casualty Insurance, A Guide Book for Agents and Brokers (13th ed. 1966), p. 90 et seq.; Williams and Heins, Risk Management and Insurance (1964), cc. 11 and 12, p. 189 et seq.; Quality Molding Co. v. American National Fire Insurance Co., 272 F.2d 779 (7 Cir. 1959).
It is therefore clear that, although the words "damage to property" may in some contexts be deemed to refer only to direct damage to property, and the terms "property insurance" and "fire insurance" may in certain circumstances refer only to insurance against direct damage, those terms *130 are not necessarily so restricted in meaning. The exculpatory clause in favor of the landlords is broad enough, without doing violence to its terms, to relieve them of liability for indirect as well as direct damage to the tenant's property.
As indicated above, this court finds that the parties undertook by paragraph 28 to procure their own property insurance and to look to that insurance, rather than to each other, for recoupment of losses sustained as the result of fire on the leased premises regardless of whose negligence, if any, caused the conflagration. Neither was obliged by the agreement to carry liability insurance, in addition to the property insurance, to satisfy obligations to the other because of loss suffered by fire. The only reasonable interpretation of paragraph 28 is that the tenant assumed the risk of both direct and indirect loss to its property. For the tenant to secure insurance against direct loss and look to the landlords for recoupment of indirect losses would leave it exposed and uninsured for indirect losses due to fire not caused by the landlords' negligence, and to hold the landlords relieved of responsibility for direct losses but liable for indirect losses caused by their negligence is a strained construction and one which does not accord with reasonable business and insurance practices. It is significant that, although paragraph 28 gave the landlords the right to cancel the lease if "the hazards of the tenant's business" made it impossible for the landlords to obtain fire insurance on their building at standard rates, the clause is completely silent as to the effect such hazards might have upon the procuring of liability insurance by the landlords to cover any liability to the tenant. This is a clear indication, along with the other circumstances in the case, that such liability was not intended.
The decision in Hardware Mutual Casualty Co. v. Mason-Moore-Tracy, Inc., 194 F.2d 173 (2 Cir. 1952), supports this conclusion. That case involved an exception in a liability insurance policy, which excluded coverage for "injury to or destruction of property owned, rented, occupied or *131 used by or in the care, custody or control of the insured." The insured, a mover, was using an elevator in a building to remove machinery therefrom, pursuant to a contract with a tenant of the building, and the elevator collapsed because of excessive weight placed upon it by the insured. The owner of the building sued the insured to recover for damage to the elevator and for loss of use of the building for rental and business purposes occasioned by the loss of use of the elevator. The insured, having settled the owner's claim, sought to recover on its policy for these amounts. The court held that since the elevator was used or controlled by the insured, direct damage to the elevator was not covered by the policy. It also held that the indirect loss was excluded, saying:
"The issue is not so clear as to the second item of damage, the loss of use of certain parts of the building. The district court held that that loss was but one item of damage arising out of a single cause of action and was also excluded since the injury to the elevator  which was the basis of the action  was excluded. The defendant correctly argues that a pleading test of what constitutes a cause of action, which test the district court applied, see Manko v. City of Buffalo, 294 N.Y. 109, 60 N.E.2d 828, does not control the question whether the parties agreed that such a loss should or should not be excluded. Nevertheless, irrespective of the applicability of this pleading test, we think that the exclusion clause exempted the type of loss here in question from coverage under the policy. It is true that the parts of the building as to which a rental and business loss was claimed were not owned, controlled or used by Mason and hence the loss claimed does not fall within the literal wording of the exclusion clause. It seems unreasonable to suppose that the parties intended the insured to bear the risk of any injury to property used by it, but not to suffer the indirect and more remote consequences which that injury might have to other property which it had not used; it would in effect mean that the exclusion clause excluded from coverage only part of the loss arising out of injury to property used by the insured. On the contrary, the exclusion clause was as broadly written as the coverage clause. Accordingly, if the loss was one which arose out of injury to excluded property, it too would seem to be excluded." (at p. 176)
The landlords are not liable to the tenant for loss of business profits and their motion for summary judgment is granted.