801 A.2d 459 (2001)
353 N.J. Super. 131
SCHOOL ALLIANCE INSURANCE FUND, as subrogee of the Great Meadows School County District, Plaintiff,
v.
FAMA CONSTRUCTION COMPANY, Thomas Construction Company, Bovis Lend Lease LMB, Inc., and Potomac Insurance Company of Illinois, Defendants.
Superior Court of New Jersey, Law Division, Warren County.
Decided February 21, 2001.
*460 Thomas J. Burns, III and Diane A. Bettino, Princeton, for plaintiff, School Alliance Insurance Fund (Reed Smith LLP).
David H. Altman, Hawthorne, for defendant, Thomas Construction Company (Jeffer, Hopkinson & Vogel).
Michael Dougherty, East Hanover, for defendant, Fama Construction Company (Passman, Dougherty & Zirulnik).
Marc H. Supcoff, New York City, for defendant, Bovis Lend Lease LMB, Inc. (Zetlin & DeChiara).
Virginia T. Shea, Paramus, for defendant, Potomac Insurance Company of Illinois (Melli, Guerin & Melli).
SEYBOLT, J.S.C.
The Great Meadows Regional School Board ("Great Meadows") hired defendant, Bovis Construction Company ("LMB") as construction manager to supervise the building of a new middle school within the Great Meadows Regional School District in Independence Township, Warren County, New Jersey. Great Meadows hired Thomas Construction Company ("Thomas") as general contractor. Thomas hired Fama Construction Company ("Fama") to perform masonry work on the school construction project. Construction work began in late spring, 1997 and by July 18, 1997, Fama had constructed certain masonry walls to a height of 13 feet. On July 18, 1997, a severe windstorm knocked down six concrete block walls. On or about March 12, 1999, Thomas, through its producer, Emar Group, Inc. advised its Commercial General Liability Coverage Policy ("CGL") carrier, Potomac Insurance Company of Illinois ("Potomac") about the loss. On April 29, 1999, Potomac denied coverage for the claim based upon exclusions *461 in its CGL policy. On behalf of Great Meadows, School Alliance Insurance Fund ("SAIF") paid over $300,000.00 for the reconstruction of the alleged improperly erected concrete walls.
The plaintiff, School Alliance Insurance Fund ("SAIF"), is a joint insurance fund formed pursuant to statute and comprised of over 100 Boards of Education throughout the State of New Jersey joined together to provide control over risk financing. SAIF seeks to collect reimbursement as subrogee of Great Meadows for the money spent by SAIF for cleanup removal and the rebuilding of the collapsed masonry walls. SAIF instituted suit against LMB, Thomas, and Fama. Thomas filed a third-party complaint for indemnity against third-party defendant, Potomac.
Several motions are presently before this court concerning the underlying facts and the insurance policy coverages. In the first motion, third-party defendant, Potomac, seeks summary judgment based on a claimed "(j)(5)" exclusion in their CGL policy. In the second motion, SAIF moves for partial summary judgment against Thomas on counts three and five of SAIF's complaint. In the other motions, Thomas, Potomac, and Fama seek summary judgment arguing that the waiver of subrogation clause contained in Thomas' contract with Great Meadows bars any claims by the subrogee. Finally, SAIF seeks summary judgment against Potomac seeking enforcement of the CGL policy.
A. Summary Judgment Standard:
R. 4:46-2(c) governing the standards on summary judgment motions, provides that a court shall render the summary judgment only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." To determine whether there is a genuine issue as to a material fact the trial court is to view the facts in a light most favorable to the non-moving party. Brill v. Guardian Life Insurance Co. of America, et al., 142 N.J. 520, 523, 536, 666 A.2d 146 (1995); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). The moving party must identify the evidence on file in the case, which establishes the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment; the party defending against a motion for summary judgment cannot defeat the motion unless it provides specific facts that show the case presents a genuine issue of material fact, such that a jury might return a verdict in its favor. Anderson, 477 U.S. at 256-57, 106 S.Ct. 2505. Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgement are likewise insufficient to defeat a proper motion for summary judgment. See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). However, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment must be granted. Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548.
B. Analysis:
(1) The applicability of the waiver of subrogation.
One of the first cases to discuss the waiver of subrogation provision was E.C. *462 Long, Inc. v. Brennan's of Atlanta, Inc., 148 Ga.App. 796, 252 S.E.2d 642 (1979), in which, pursuant to a contractual agreement, the owner took out a builder's risk insurance policy on behalf of himself, the general contractor and subcontractors. Following an explosion and fire at the construction site, the Georgia Court of Appeals held that the insurer, which paid the owner for damages, could not recover in a subrogation action against the general contractor. The Court explained its decision by way of analogy to the United States Supreme Court case, Luckenbach v. W.J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918). In Luckenbach, a shipper insured his goods for transportation, and the bill of lading with a carrier contained the following clause:
In case of any loss, detriment or damage done to or sustained by said goods or any part thereof for which the carrier shall be liable to the shipper ... the carrier shall to the extent of such liability have the full benefit of any insurance that may have been effected upon or on account of said goods.
The Supreme Court held:
Such a clause is valid, because the carrier might himself have insured against the loss, even though occasioned by his own negligence; and if a shipper under a bill of lading containing this provision effects insurance and is paid the full amount of his loss, neither he nor the insurer can recover against the carrier.
The Court in Brennan's, analogized the contractor with the carrier in Luckenbach, the owner with a shipper and the construction contract with a bill of lading. It held that the parties expressly contracted to waive all rights against each other for the fire damage to the extent covered by insurance.
In the same year, an Indiana court reached the same result in South Tippecanoe School Building Corp. v. Shambaugh & Son Inc., 182 Ind.App. 350, 395 N.E. 2d 320 (1979) in ruling that the owner's insurer was not entitled to subrogation against various defendants including the contractor, subcontractor and architect. The owner was paid by an insurer pursuant to the builders risk insurance policy following a gas explosion and fire at a school building during the process of construction. The Court found that under the construction contract, the parties intended any and all construction project risks be covered by an insurance policy. The Court reasoned that the insurance was intended to constitute the exclusive source for the redress of damages, so the provisions of the contract prevented the owner, and hence, the owners' insurer, from recovering against any of the defendants. Since Brennan's and Tippecanoe were decided, Courts across the country have found against the insurer and have concluded that the insured had waived those rights the insurer possessed by way of subrogation.
In May fair Fabrics v. Henley, 48 N.J. 483, 226 A.2d 602 (1967), the New Jersey Supreme Court recognized that the parties to a contract may agree to distribute the risks attendant thereon and to designate who shall obtain the necessary insurance. This type of agreement was described carefully by Judge Ackerman in the law division, as follows:
[t]hese rules favor the construction contended for by the tenant, who urges that the clause in question grants to both parties equal immunities from liability which are mutual and reciprocal. It is not necessary, however, to decide this motion on the basis of any rules of strict construction in favor of one party against the other. Here we have a commercial lease entered into between businessmen. In plain and unmistakable *463 language, they mutually agree that each would insure his own property against loss by fire at his own expense. Their agreement should be construed to accord with the understanding of reasonable businessmen, and in harmony with the modern judicial view that provisions in leases and other commercial agreements such as that here involved, whether couched in language of indemnity or exculpation or imposing obligations with respect to obtaining insurance, are to be viewed realistically as normal common-sense efforts by businessmen to allocate between them the cost or expense of risks of property damage. They contemplate that such risks will be covered by insurance, and the only practical feature of such bargains ordinarily is the decision as to who is to bear the cost of insurance.
(97 N.J.Super. 116, 123, 234 A.2d 503 (1967)) (other citations omitted).
Pertinent to the issue before this court on motion, the trial court in Mayfair held that the subrogee insurance carrier was barred from recovery by the exculpatory lease provision. Judge Ackerman wrote:
Although the right of an insurance company to enforce subrogation rights in appropriate cases has long been well settled, it is also clear that subrogation is not applicable when its enforcement would be inconsistent with the terms of a contract or where the contract, either expressly or by implication, forbids its application. 97 N.J.Super. 116, 234 A.2d 503; Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 104 A.2d 288 (1954); Ganger v. Moffett, 8 N.J. 73, 83 A.2d 769 (1951).
Courts in other jurisdictions have dealt with the waiver of subrogation issue in a similar fashion. The reasoning of the New Hampshire Supreme Court in Chadwick v. CSI, Ltd., 137 N.H. 515, 629 A.2d 820 (1993) correctly represents the approach taken by courts. In holding that the waiver clause effectively waived any rights that the owner had against an allegedly negligent subcontractor, the Chadwick Court stated that the language evidenced an intent of the parties to allocate construction risks to their insurers, and thus insurance was the exclusive remedy available. Accordingly, where the insured had no pursuable rights against third parties neither did the insurer.
Likewise, Richmond Steel, Inc. v. Legal and Gen. Assurance Society, 821 F.Supp. 793, 800 (D.C.Puerto Rico 1993) stated, "[t]he purpose of a waiver of subrogation clause in construction contracts is to avoid disruptions and disputes between the parties working on a project .... The clause is also meant to require a party to the contract to provide insurance for all the parties." The Richmond Court went on to state further that "when a construction contract contains a waiver of subrogation between the parties, this clause precludes an insured party's insurer from bringing a subrogation action against one of the other parties to the contract." Id. at 800-801.
Similarly, the Third Circuit in Commercial Union v. Bituminous Casualty Corp., 851 F.2d 98 (1988), discussed the issue of subrogation and waiver. In Commercial Union, the owner of a shopping center in Marlton, NJ, Kode Development Associates, entered into an agreement with Arnko Builders Inc., in which Arnko was set forth as a general contractor for the construction of a shopping center. Arnko subcontracted with Pharaoh Construction Company to perform masonry work for the project.
The agreement between Kode and Arnko was a standard American Institute of Architects agreement, which provided in pertinent part:

*464 The owner and contractor waive all rights against each other and the subcontractors... for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this Paragraph 11.3 or any other property insurance applicable to the work. Article 11.3.6.
The Court reviewing the version of the AIA contract under consideration, concluded essentially that the contract operated to shift to the owner the ultimate risk of loss which then transferred to the insurer for valuable consideration leaving the insurer no right to proceed by subrogation against a subcontractor with respect to property loss. Commercial Union; Haemonetics Corp. v. Brophy & Phillips Co., Inc., 23 Mass.App. 254, 501 N.E.2d 524 (1986) (other citations omitted).
Similarly, defendants argue that Great Meadows relinquished its rights against them since it collected from its insurance company, SAIF, money for the storm damage. Defendants further contend that the payment of insurance policy covering the loss, triggered the agreement between Great Meadows and Thomas which waived all rights against the other. SAIF in its opposition states that the waiver of subrogation clause is a small piece of a contract and other provisions in the contract allow SAIF to recover against Thomas. More specifically, SAIF argues that an indemnification provision in the contract required Thomas to indemnify SAIF, Great Meadows' subrogee for the loss. The waiver of subrogation provision in the contract states:
The owner, the contractor, the owner's representative, and the consultants, its subcontractors and manufacturers, if any, and their agents and employees for damages caused by fire or other perils, to the extent covered by required insurance or any other property insurance applicable to the work, hereby waive all rights against each other, except such rights as they may have to the proceeds of such insurance.
The purpose behind a mutual waiver of subrogation is to assure that, to the extent any loss is covered by a policy, the insurer should bear the risk of loss, regardless of any fault on the part of one or both of the parties. Another purpose is to prevent a potential windfall to the insurer subrogated to the rights of the insured against the other parties to the contract. Because the insurer presumably has considered the risk of loss in establishing its premiums, the insurer should not have the ability to recoup that loss by subrogation against the other parties allegedly causing the loss. There has been no hesitancy in upholding and enforcing the waiver provisions in both federal and state courts throughout the United States. The courts have also applied the waiver provisions to all parties identified in the clause. In some cases, an insurer had paid its named insured for damages to a construction project caused by the alleged negligent conduct of another, but the courts have held that pursuant to the contract terms, the insurer could not bring a subrogation action. See Chadwick.
SAIF contends that the strict application of the waiver of subrogation is unfair to SAIF as it leaves SAIF with no remedy. SAIF argues that the waiver of subrogation clause should be disregarded as contrary to other indemnity and insurance provisions in the contract. Specifically, SAIF argues that unlike Richmond Steel or Chadwick, supra, the waiver of subrogation clause in the Thomas/Great Meadows contract does not expressly preclude Great Meadows from enforcing Thomas' contractual duty to indemnify it for any and all losses arising from the work of itself or its subcontractors. However, if *465 Great Meadows did not intend to be bound by the waiver of subrogation clause, or, if Great Meadows felt that the language contradicted other language in the policy, it could have easily crossed off that clause before signing the contract. Besides, the waiver which "... waive[s] all rights against each other," does state that "except such rights as they may have to the proceeds of such insurance". Therefore, SAIF could recover from insurance proceeds, if any. As decided in Mayfair, business people have the right to determine that the risks of a transaction shall be borne by insurance. Accordingly, this court finds that the waiver of subrogation does indeed apply to this case. Consequently, this court concludes that the waiver of subrogation policy is best effectuated by interpreting the clause as effectively abrogating any subrogation right of SAIF against Thomas and Fama.
This court will now briefly discuss the separate but related motions. More specifically, (1) whether Thomas breached its duty to procure insurance, (2) whether the waiver of subrogation bars SAIF from any recovery from insurance proceeds, and (3) whether Potomac is obligated to cover Thomas, notwithstanding the "j (5)". At the outset, this court finds that Thomas did not breach its contractual duty to obtain insurance. The insurance provided in the contract were obtained by Thomas, presented to the Great Meadows Regional School Board for its approval, and subsequently approved by that body. Therefore, Thomas did not breach its contractual duty to obtain insurance. With respect to (2) and (3), although the waiver of subrogation is applicable in this case, it does provide for recovery from insurance proceeds.[1] SAIF filed a motion seeking relief against Potomac pursuant to its contract with Thomas. Potomac in opposition states that the "j (5)" exclusion in its policy precludes recovery for the loss in issue here. Therefore, the last inquiry left to be made is whether the policy issued by Potomac covers this loss in question. If it does then SAIF can recover from Potomac, notwithstanding the waiver of subrogation clause. If, however, the Court finds that the "j (5)" exclusion is applicable, then SAIF is left with no remedy.
Potomac argues that even if Thomas is contractually bound to indemnify Great Meadows/SAIF for the loss at hand, such obligation is not covered under Potomac's CGL policy. The loss at issue in this matter is the collapse of six walls on a construction site. The collapse occurred before the walls were completed. Pursuant to exclusions "j (5)", of Potomac's CGL policy, Potomac argues that such loss is an excluded risk both as to the insured (Thomas) and the additional insured.
Although there is no New Jersey case law directly on point which analyzes the "j (5)" exclusionary language of a standard CGL policy, case law from other states have discussed this type of exclusion. A Florida court case addressing the issue of insurance coverage for defective construction involved a policy with similar language. In Lassiter Construction Co. v. American States, 699 So.2d 768 (Fla. 4th DCA 1997), that policy provided:
Under Coverage A. Bodily Injury and Property Damage Liability, the policy provides in part:
....
*466 b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;"....
"Occurrence," is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
Under the Exclusions portion of the contract it is provided that the insurance does not apply to:
j. "Property damage" to:
....
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations....
In Lassiter, the court determined that the insured failed to demonstrate that any sections of the insurance policy provided coverage for defective construction.
Furthermore, in Crawford v. Travelers Insurance, 838 F.Supp. 157 (S.D.N.Y. 1993), an insured contractor brought suit against its insurer seeking indemnification for claim arising out of contractor's renovations of an apartment. On cross motions for summary judgment, the District Court held that exclusion precluded coverage. The court further noted that although New York law governs the case, there were no New York cases interpreting the language of Section (j)(5) or comparable provisions. However, the District Court stated that courts in other states have uniformly rejected plaintiff's position. See, e.g., Jet Line Servs. Inc. v. American Employers Ins. Co., 404 Mass. 706, 537 N.E.2d 107 (1989) ("that particular part of any property ... upon which operations are being performed" referred to entire tank which the insured had been retained to clean, not merely to the bottom of the tank which it was cleaning at the moment of explosion); Goldsberry Operating Co. v. Cassity, Inc., 367 So.2d 133 (La.Ct.App. 1979) ("that particular part of any property... upon which operations are being performed by.... the insured at the time of the property damage" covered explosion damage to an oil and gas well at depth of 6900 feet even though the area of the well that the insured had been retained to perforate was at 8000 feet); Vinsant Elec. Contractors v. Aetna Casualty & Sur. Co., 530 S.W.2d 76 (Tenn.1975) ( "that particular part of any property ... upon which operations are being performed" was not limited to "precise and isolated spot" upon which work was being done); Vandivort Constr. Co. v. Seattle Tennis Club, 11 Wash.App. 303, 522 P.2d 198 (1974) ( "that particular part of any property ... upon which operations are being performed by... insured" was not limited to that part of real property where work was being performed).
The Commercial General Liability form in this case contains five sections. Section I deals with three types of coverage; A, B, and C. Coverage A covers bodily injury and property damage liability; Coverage B covers personal and advertising injury liability; finally, Coverage C covers medical payments. Coverage A deals with this present situation and contains under subheading (2) "Exclusions". It states that
"[t]his insurance does not apply to:
(j) Damage to property where:
(5) That particular part of real property on which you or any contractor or subcontractors working directly or indirectly on your behalf are performing operations, if the "property *467 damage" arises out of these operations."
This court, based on the similarities in the policy language in Lassiter and in this case, reaches the same conclusion. As in Lassiter, this court also recognizes that the policy exclusions cannot create coverage where there is no coverage in the first place.
Therefore, although SAIF could have proceeded against Potomac to recover money, it is nevertheless barred in light of the clear exclusion contained in Potomac's policy. Summary judgment is therefore granted against SAIF.
C. Conclusion:
Potomac's motion for summary judgment asserting that "j(5)" exclusion bars any claim by Thomas Construction is GRANTED.
SAIF's motion for partial summary judgment against Thomas on counts 3 and 5 of SAIF's complaint is DENIED.
Thomas, Potomac and Fama's motions for summary judgment stating that waiver of subrogation bars SAIF's complaint is GRANTED only as to Thomas and Fama.
SAIF's motion seeking recovery from Potomac is DENIED.
Potomac's cross-motion seeking declaratory judgment in that the "j(5)" exclusion policy precludes any recovery is GRANTED.
NOTES
[1] The owner, the contractor, the owner's representative, and the consultants, its subcontractors and manufacturers, if any, and their agents and employees for damages caused by fire or other perils, to the extent covered by required insurance or any other property insurance applicable to the work, hereby waive all rights against each other, except such rights as they may have to the proceeds of such insurance.