SOUTH TIPPECANOE SCHOOL
BUILDING CORPORATION,
Appellant (Plaintiff Below),

v.

SHAMBAUGH & SON, INC., Monitor Products, A Division of Comerco, Inc., Lee J. Brockway, John A. Shaver, John F. Swindell, Robert I. McKay, and Robert S. Osmond, d/b/a Shaver and Company, Paul Akers, Incorporated, Worrall Propane Corporation and T & S Construction, Inc., Appellees (Defendants Below).

No. 1–1278A361.

Court of Appeals of Indiana,
First District.

Oct. 10, 1979.

Rehearing Denied Nov. 13, 1979.

Brent E. Dickson, Dickson, Reiling & Teder, Lafayette, for appellant.

Arthur P. Kalleres, David L. Gray, Ice, Miller, Donadio & Ryan, Indianapolis, and David A. Ault, Wernle, Ristine & Ayres, Crawfordsville, for appellee, Shambaugh & Son, Inc.

Randolph A. Leerkamp, John R. Hiner, Osborn & Hiner, Indianapolis, for appellee, Paul Akers, Inc.

John T. Lorenz, Kightlinger, Young, Gray & De Trude, Indianapolis, for appellee, Monitor Products, A Division of Comerco, Inc.

Nicholas C. Nizamoff, White, Raub, Reis, Wick & Riegner, Indianapolis, for appellees, Lee J. Brockway, John A. Shaver, John F. Swindell, Robert I. McKay, and Robert S. Osmond, d/b/a Shaver and Co.

ROBERTSON, Judge.

### PREFACE AND FACTS

Generally stated, this appeal involves the right of builder's risk insurance subrogation

against allegedly negligent contractors, subcontractors, and architects.

Plaintiff-appellant South Tippecanoe School Building Corporation's (South Tippecanoe) complaint against defendant-appellees Shambaugh, etc. (Defendants) alleging negligence, strict liability, breach of implied warranty, and breach of contractual warranty, sought damages for losses sustained in a gas explosion and fire at a Tippecanoe County high school which was in the process of construction. Of the $75,628.63 damages claimed,[1] South Tippecanoe was paid $74,-628.63 by the Hartford Insurance Company pursuant to builder's risk insurance—with the remaining $1000 representing South Tippecanoe's deductible. This action is thus a subrogation action prosecuted by the Hartford.

The Defendants herein are Shambaugh & Son, Inc. (Shambaugh), subcontractor for mechanical work, including plumbing and heating, to the general contractor, K. H. Kettlehut & Co., Inc.; Monitor Products, A Division of Comerco, Inc. (Monitor), "Contractor" for general case work and booth-bench seating under contract with Tippecanoe School Corporation;[2] Shaver and Company (Shaver), architects; and, Paul Akers, Incorporated (Akers), variously described as subcontractor and materialman, and sub-subcontractor.[3]

## SUMMARY JUDGMENT AND ISSUE

Upon motions for summary judgment by the Defendants and South Tippecanoe's motion for partial summary judgment on the issues raised by Defendants' motions, the trial court granted the former motions and denied the latter. Its judgment, omitting formal parts, is as follows:

The Court, having had under advisement the motions for summary judgment of defendants, Shambaugh & Son, Inc., Paul Akers, Inc., Monitor Products, a division of Comerco, Inc. and Shaver and Company, also, of motion of plaintiff for partial summary judgment. Having heard argument and having considered such motions, now finds that there is no genuine issue as to any material fact with regard to the provisions of the contracts entered into as set forth in the pleadings, the relationships of the various parties, the manner in which the loss was incurred and the right of plaintiff's insurance carrier to subrogation to any recovery plaintiff may obtain.

The Court further finds that, as a matter of law, the provisions of the contracts prevent plaintiff from recovering against any of said defendants and that said defendants are entitled to judgments in their favor and against plaintiff; that the motion of each said defendant for summary judgment should be granted and the motion for partial summary judgment, filed by plaintiff, should be denied.

The Court further finds that there is no reason for delay in entering final judgment for and on behalf of said defendants and against plaintiff; that the issues between such parties are fully adjudicated by this entry and that final judgment as to such parties should be granted.

South Tippecanoe's appeal from this summary judgment raises essentially this issue: whether the trial court correctly found that certain provisions of the contracts involved herein bar recovery of amounts paid out under a builder's risk insurance policy from allegedly negligent Defendants.

1. South Tippecanoe concedes in its brief that of the total damages claimed it should not be entitled to recover from Shambaugh the $4,439.30 attributable to, and paid for, Shambaugh's property loss; South Tippecanoe's claim against Shambaugh is limited to $71,-179.33. Similarly, concedes South Tippecanoe, its claim against Monitor does not include the $9,425.00 paid Monitor attributable to Monitor property damage. The South Tippecanoe claim against Monitor is thus limited to $66,203.63.

2. Tippecanoe School Corporation is South Tippecanoe's alter ego.

3. Worrall Propane Corporation and T & S Construction, Inc. are named defendants-appellees, however, no contentions are made with respect to them and no briefs have been filed on their behalf. Also, they did not participate in the oral arguments before this court.

RELEVANT CONTRACT PROVISIONS

The construction at issue here was governed by a contract between South Tippecanoe ("Owner" under the contract) and the general contractor Kettlehut ("Contractor" under the contract). The following clauses of the General Conditions of the Contract for Construction are most relevant for our discussion and decision here:

11.3 PROPERTY INSURANCE [Paragraph]

11.3.1 Unless otherwise provided, the Owner shall purchase and maintain property insurance upon the entire Work[4] at the site to the full insurable value thereof. This insurance shall include the interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work and shall insure against the peril of Fire, Extended Coverage, Vandalism and Malicious Mischief. [Subparagraph]

.    .    .    .    .

11.3.3 Any insured loss is to be adjusted with the Owner and made payable to the Owner as trustee for the insureds, as their interests may appear,    .    .    . [Subparagraph]

.    .    .    .    .

11.3.6 The Owner and Contractor waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance provided under this Paragraph 11.3, except such rights as they may have to the proceeds of such insurance held by the Owner as trustee. The Contractor shall require similar waivers by Subcontractors and Sub-subcontractors in accordance with Clause 5.3.1.5. In waiving rights of recovery under terms of this paragraph, the term "Owner" shall be deemed to include his employees and the Architect and his employees as the Owner's representative as provided for in the Contract Document. [Subparagraph]

5.3 SUBCONTRACTUAL RELATIONS [Paragraph]

5.3.1 All work performed for the Contractor by a Subcontractor shall be pursuant to an appropriate agreement between the Contractor and the Subcontractor (and where appropriate between Subcontractors and Sub-subcontractors) which shall contain provisions that: [Subparagraph]

.    .    .    .    .

.5 waive all rights the contracting parties may have against one another for damages caused by fire or other perils covered by the property insurance described in Paragraph 11.3, except such rights as they may have to the proceeds of such insurance held by the Owner as trustee under Paragraph 11.3;  .    . [Clause]

In fulfilling the 11.3.1 requirements, South Tippecanoe obtained builder's risk insurance. The Hartford builder's risk policy, whose named insured is South Tippecanoe, includes these relevant provisions:

II.  PROPERTY COVERED

A.  This policy covers on the building(s) or structure(s) described herein while in the course of construction, erection, fabrication, repair or completion, including foundations, additions, attachments and all permanent fixtures belonging to and forming a part of said building(s) or structure(s).

B.  This policy also covers temporary structures at the job site; and in addition, materials, equipment and supplies of all kinds pertaining to the construction of said building(s) or structure(s) or temporary structure(s), while temporarily held at any location within the United States or Canada prior to delivery to the job

---

4. Under Subparagraph 1.1.3 of Paragraph 1.1, "Definitions", it is stated with respect to "The Work":

The term Work includes all labor necessary to produce the construction required by the Contract Documents, and all materials and equipment incorporated or to be incorporated in such construction.

site, while in transit to and after delivery at the job site, and while there awaiting installation and during installation.

C. This policy also covers, WHEN NOT OTHERWISE COVERED BY INSURANCE, builders' machinery, tools and equipment owned by the insured or similar property of others for which the insured is legally liable, all while contained in said building(s) or structure(s) or temporary structure(s) or on vehicles, or in the open; only while on the described premises or within 100 feet thereof.

. . . . .

## XV. SUBROGATION

In the event of any payment under this policy, the Company shall be subrogated to all of the Insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after loss to prejudice such rights.

This insurance, however, shall not be invalidated should the Insured waive in writing prior to a loss to the described property any or all right of recovery against any entity for whom work is being performed, or against any subcontractor working on the job insured hereunder.

## CONTENTIONS OF THE PARTIES

The respective positions of the Defendants in this cause merit individual attention; however, in that their arguments embrace repeated themes, we will set forth and respond to those common contentions before treating the individual concerns.

The Defendants submit that subparagraph 11.3.1 of the General Conditions obligated South Tippecanoe to purchase and maintain property insurance covering the full insurable value of the project including the interests of the owner, contractor, subcontractors, and sub-subcontractors. In suing the co-defendants, contend the Defendants, South Tippecanoe is suing its own

insureds—an action South Tippecanoe cannot take according to the weight of authority from other jurisdictions and our Third District's recent *Morsches Lumber v. Probst*, (1979) Ind.App., 388 N.E.2d 284 (transfer pending), decision. Defendants further submit that by reason of subparagraph 11.3.6 of the General Conditions, South Tippecanoe waived all rights against the Defendants. Defendants maintain that the contract provisions evince an intent to place the risk of loss which might arise in the course of construction upon insurance, and respecting damage to the Work, an intent to waive rights among the parties for damages to the Work, except rights to the proceeds of the property insurance required under the contract.

Appellant South Tippecanoe contends that the plain meaning of the contract provisions requires conclusions opposite those of the Defendants. In urging that we confirm builder's risk insurance subrogation against negligent contractors and subcontractors, South Tippecanoe, though acknowledging *Morsches*'s existence, asserts, "There remains no ruling Indiana precedent on this issue." South Tippecanoe argues that foreign jurisdiction cases, the "prevailing custom and practice in our state, and the strong support in Indiana for subrogation" bolster its position. South Tippecanoe contends that Defendants' "waiver assertions are also in direct opposition to other specific contract terms and the contract as a whole." Finally, it is alleged that provision 11.3.6 is either definite or ambiguous: if not ambiguous, South Tippecanoe avers, the language is "clear" and "contains no provision compelling [sic] the Owner to waive rights against Subcontractors and Sub-subcontractors," nor against the architect, Shaver; if 11.3.6 is found ambiguous, "the question of construction is one of mixed law and fact, precluding summary judgment."

## DECISION

Having carefully weighed the respective arguments of the parties, we find that we are better persuaded by those of the Defendants.

## DISCUSSION

Inasmuch as we are reviewing a summary judgment, the same is properly granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind.Rules of Procedure, Trial Rule 56(C). Evidence, pleadings, and inferences must be viewed in a light most favorable to the party against whom summary judgment is sought (South Tippecanoe), *Wozniczka v. McKean,* (1969) 144 Ind.App. 471, 247 N.E.2d 215, and the burden is on the proponent (Defendants) to show that no material issue of fact exists. *McNabb v. Mason,* (1970) 148 Ind.App. 233, 264 N.E.2d 623. If there is any doubt as to the existence of a genuine issue of material fact, such doubt must be resolved against the party moving for summary judgment (Defendants). *McGinnis v. Public Service Co. of Indiana, Inc.,* (1974) 161 Ind.App. 1, 313 N.E.2d 708. And pertinent to our concerns here, motions for summary judgment in insurance contract actions present a different approach than in negligence actions. *Ebert v. Grain Dealers Mutual Insurance Co.,* (1973) 158 Ind.App. 379, 303 N.E.2d 693. This language from *Ross v. Farmers Insurance Exchange,* (1971) 150 Ind.App. 428, 442, 277 N.E.2d 29, 37, according to the *Ebert* court, "noted the difference" [5]:

> Unlike negligence cases, the undisputed facts are not juxtaposed against the standard of a reasonable man, but rather such facts are interpreted against a specific policy provision, and there are certain situations which clearly show that the insured has not brought himself within the confines of the policy.

With this summary judgment backdrop, we should also note that underlying our analysis are certain established principles of contract construction and interpretation. To begin, the court in *Wilson v. Kauffman,* (1973), 156 Ind.App. 307, 314–15, 296 N.E.2d 432, 437, stated:

> As a general rule the interpretation, construction or legal effect of a contract is a question to be determined by the

court as a matter of law. *U.S.F. & G. v. Baugh,* 146 Ind.App. 583, 257 N.E.2d 699 (1970). However, another equally well accepted rule is that the construction of a contract is for the jury, where the terms of a contract are ambiguous and their meaning is to be determined by extrinsic evidence. *Brumfield v. State ex rel. Wallace,* 206 Ind. 647, 190 N.E. 863 (1934); *Modern Woodmen of America v. Hall,* 190 Ind. 493, 130 N.E. 849 (1921); *Reissner v. Oxley,* 80 Ind. 580 (1881). Where a written contract is unambiguous the trial court should construe it and inform the jury as to its meaning. However, if it is ambiguous the particular ambiguity should be selected and submitted to the jury under proper instructions. *Vulcan Iron Works Co. v. Electro Magnetic Gold Mining Co.,* 54 Ind.App. 28, 99 N.E. 429, reh. den., 54 Ind.App. 28, 100 N.E. 307 (1912). Also, when extraneous facts and circumstances are necessary to explain an ambiguous or uncertain contract the question of construction is one of mixed law and fact. *Mobley v. J. S. Rogers Co.,* 68 Ind.App. 308, 119 N.E. 477 (1918). Strictly speaking the interpretation of the contract is not submitted to the jury insofar as the question is one of construction and of law, but, the facts on which that construction rests must be determined by the jury. *Portland Body Works v. McCullough Motor Supply Co.,* 72 Ind. App. 216, 119 N.E. 180 (1918). The construction of an ambiguous contract is a question of law where the ambiguity arises by reason of the language used and not because of extrinsic facts. *Prather v. Ross,* 17 Ind. 495 (1861).

Moreover, our Judge Lybrook in *Bd. of Dir., Ben Davis, etc. v. Cloverleaf Farms, Inc.,* (1977) Ind.App., 359 N.E.2d 546, wrote for this court:

> In construing a contract, several maxims should be kept in mind. First, the instrument should be construed as a whole, *Linton v. Linton,* (1975) Ind.App., 336 N.E.2d 687, and, it should be so construed, if possible, as to render the agree-

---

**5.** 158 Ind.App. at 384, 303 N.E.2d at 697.

ment valid rather than void. *Wiltse v. Cornell,* (1970) 146 Ind.App. 447, 256 N.E.2d 572. Furthermore, the purpose of construing a contract is to ascertain the intention of the parties at the time of the making of the contract, *Robison v. Fickle,* (1976) Ind.App., 340 N.E.2d 824, from the language used in the instrument, *Fort Wayne Bank Bldg., Inc. v. Bank Bldg. & Equipment Corp.,* (1974) Ind.App., 309 N.E.2d 464, unless there is an ambiguity. *House v. Lesow,* (1975) Ind.App., 339 N.E.2d 86. The test for determining whether a contract is ambiguous is whether or not reasonable men would find the contract subject to more than one interpretation. *Myers v. Maris,* (1975) Ind.App., 326 N.E.2d 577.

359 N.E.2d at 549 (footnote omitted).

These tests when applied to the construction contract here require our conclusion that the contract involved is subject but to this reasonable construction: it evinces an intent to place any risk of loss on the Work on insurance; the Defendants are intended "insureds" under the builder's risk policy; and, the waiver provisions are fully applicable here. This conclusion is consistent with the evolving Indiana rule represented by *Morsches* and cases from other jurisdictions which represent what we think is the better rule.

We agree with the suggestion of defendant Shambaugh that provisions of Article 11 of the General Conditions reveal a "studied attempt" by the parties to require construction project risks to be covered by insurance and to "allocate among the parties the burden of acquiring such insurance." According to Article 11, liability insurance was to be carried by the Contractor and the subcontractors,[6] and the Owner.[7] The juxtaposition of this liability coverage with the 11.3 Property Insurance provision is rendered sensible when subparagraph 4.18, Indemnification, is considered. It provides:

4.18.1 The Contractor shall indemnify and hold harmless the Owner and the Architect and their agents and employees from and against all claims, damages, losses and expenses including attorneys' fees arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder.

Conspicuous by its exclusion from the indemnification and hold harmless clause is injury to or destruction of the Work. Any recourse by the parties, however, for damage to the Work by the enumerated perils was to be limited to the property insurance required by 11.3.1 and which included the interests of all parties in the Work. And under 11.3.3, an insured loss was to be adjusted with the Owner and made payable to the Owner as trustee for the insured(s). The 11.3.6 waiver provisions add further strength to these points. Pursuant to 11.3.-6, the Owner and Contractor waive rights for damages covered by the property insurance, except rights to proceeds; in addition, the Contractor was to require similar waivers by Subcontractors and Sub-subcontractors. The requirement of waivers, we are convinced, is consistent with an intent to place the risk of loss on insurance. Nevertheless, we are left with the more direct question whether the risk of fire, caused allegedly by negligence, was to be borne by insurance. If so, then we will deny subrogation against those Defendants whose interests qualify under the contract and in whose favor the Owner's contractual waiver operate. The recent *Morsches* case speaks to the problem.

■ In *Morsches,* the Third District considered the question "whether an agreement to provide insurance constitutes an

---

6. See: Appendix A.

7. See: Appendix A.

agreement to limit the recourse of the party acquiring the policy solely to its proceeds even though the loss may be caused by the negligence of the other party to the agreement."[8] 388 N.E.2d at 285. In deciding this issue in the affirmative, the *Morsches* court first adverted to *Woodruff v. Wilson Oil Co., Inc.,* (1978) Ind.App., 382 N.E.2d 1009—a case where a lease agreement required the lessor to carry fire insurance. "Because a lessor may always carry insurance for its own benefit," wrote Judge Garrard in *Morsches*, "we determined that this clause would be surplusage unless construed as being for the lessee's benefit." *Ibid.* The court goes on to note that "[i]n the context of commercial and construction contracts, clauses imposing upon one party the duty to provide insurance have been similarly construed to benefit both parties[,]" *id.* at 286, and then discusses the varied responses of the courts when the issue of negligence is injected into the insurance agreement scenario. The Third District's response was as follows:

> . . . we do not believe that the relative foreseeability of the actual cause of the loss should be determinate of whether the parties intended to insure against it. Rather it appears to us that where neither party has a legal duty to insure but each foresees the potential of a loss occurring by negligence or accident, the reasonable expectation of both in expressly imposing the duty to insure against the loss upon one of them is that the other will be protected as fully as if he had assumed the duty himself. There is no need to apply to such agreements the standard applied to indemnity agreements. With agreements to insure, the risk of loss is not intended to be shifted to one of the parties; it is intended to be shifted to an insurance company in return

for a premium payment. Neither party intends to assume a potential liability; rather both are demonstrating "normal" business foresight in avoiding liability and allocating it to an insurer. *Mayfair Fabrics v. Henley,* (1967) 97 N.J.Super. 116, 234 A.2d 503. There is, therefore, no need to find an intent to assume liability as there is in indemnity cases.

> Thus, we believe the better reasoning is found in those cases holding that an agreement to insure is an agreement to provide both parties with the benefits of insurance. Individuals understand that insurance will protect them against the consequences of their own negligence and more than likely assume that if one who is a party to a contract agrees as part of his or its duties to provide insurance, that the insurance will protect both of them regardless of the cause of the loss (excepting, of course, wanton and willful acts). If that were not their intent, each would provide his or its own insurance protection and there would be no need for the contract to place the duty on one of them.

388 N.E.2d at 286–87.

This *Morsches* reasoning, which we approve and adopt, applies with even greater force in the present case. The construction contract here explicitly required that the property insurance procured by South Tippecanoe include the interests of the various contracting parties. That the protection thereby afforded was intended to constitute the exclusive source for redress of damages sustained is buttressed by the waiver provisions discussed above. Therefore, these provisions convincingly lead to the conclusion that the parties were to be limited in recovery for property damage to the proceeds of the insurance required to be

---

**8.** The *Morsches* problem arose from these facts: the Morsches (builder)—Probst (owner) construction agreement for a cattle pole barn called for Probst to carry fire and windstorm insurance and for Morsches to carry compensation and liability insurance. Probst collected on the builder's risk policy when a windstorm destroyed the barn during the course of the barn's construction. Probst's subsequent ac-

tion alleged that negligence in Morsches's construction resulted in the barn's destruction during the windstorm. The trial court found Morsches negligent and that the negligence was the proximate cause of the barn's destruction. On appeal, however, the Third District held that Probst was limited to the proceeds of the insurance policy.

carried under the contract, rather than to the individual assets of a negligent Defendant.

Our statements here and those of the Third District in *Morsches* are consistent with the weight of authority from other jurisdictions which holds that a builder's risk insurer is not entitled to subrogate against one whose interests are insured even though the party's negligence may have occasioned the loss, in the absence of design or fraud.[9] Though the cases are many [10], we highlight excerpts but from these few we think are representative of the majority and better reasoned, and with which we are now aligned: *Baugh-Belarde Construction Co. v. College Utilities Corp.,* 561 P.2d 1211 (Alaska 1977); *St. Paul Fire and Marine Insurance Co. v. Murray Plumbing and Heating Corp.,* 65 Cal.App.3d 66, 135 Cal.Rptr. 120 (1976); *Board of Education v. Hales,* 566 P.2d 1246 (Utah 1977); *Midwest Lumber Co. v. Dwight E. Nelson Construction Co.,* 188 Neb. 308, 196 N.W.2d 377 (1972); and, *Commerce and Industry Insurance Co. v. Orth,* 254 Or. 226, 458 P.2d 926 (1969).

The issue examined in *Baugh-Belarde* was whether a subcontractor's immunity from liability in a subrogation action was limited to the amount of loss to its own property in a construction project. The problem arose from these facts: a general contractor counterclaimed for the amount of loss caused by fire alleging that the subcontractor had breached its contract and that its negligence had caused the fire; the counterclaims were brought on behalf of an insurer which had issued a builder's risk policy to the general contractor. The policy had been extended by endorsement to cover the subcontractors on a construction site, to the extent of their interest in the project.

In affirming a grant of partial summary judgment that the insurer could not recover against the subcontractor through subrogation, the Alaska Supreme Court first observed that the "limiting language" [11] in the policy at issue "has not stopped other courts from viewing subcontractors as insureds in order to prevent them from being liable in subrogation claims for property not their own." 561 P.2d at 1213. The *Baugh-Belarde* court looked to *New Amsterdam Casualty Co. v. Homans-Kohler, Inc.,* (D.R.I. 1969) 305 F.Supp. 1017, where subrogation was sought against allegedly negligent subcontractors who were covered under a builder's risk policy "As Their Respective Interests May Appear." Noting that "the *New Amsterdam* court was not willing to rely on that phrase to distinguish between the insured status of the owner and that of the subcontractors," 561 P.2d at 1214, *Baugh-Belarde* agreed with the *New Amsterdam* view of the policy as providing single coverage for all insureds.[12] *Ibid.*

9. No design or fraud on the part of the Defendants is claimed herein.

10. *E. g., Independent School District No. 877 v. Loberg Plumbing & Heating Co.,* 266 Minn. 426, 123 N.W.2d 793 (1963); *Glen Falls Insurance Co. v. Globe Indemnity Co.,* 214 La. 467, 38 So.2d 139 (1948); *Louisiana Fire Insurance Co. v. Royal Indemnity Co.,* 38 So.2d 807 (La.App. 1949); *United States Fire Insurance Co. v. Beach,* 275 So.2d 473 (La.App.1973); *New Amsterdam Casualty Co. v. Homans-Kohler, Inc.,* 305 F.Supp. 1017 (D.R.I.1969), 310 F.Supp. 374 (D.R.I.1970), *modified and aff'd,* 435 F.2d 1232 (1st Cir. 1970; *Transamerica Insurance Co. v. Gage Plumbing & Heating Co.,* 433 F.2d 1051 (10th Cir. 1970); *Home Insurance Co. v. Pinski Brothers, Inc.,* 160 Mont. 219, 500 P.2d 945 (1972); *Factory Insurance Association v. Donco Corporation,* 496 S.W.2d 331 (Mo.App. 1973). *See also Stafford Metal Works, Inc. v. Cook Paint and Varnish Co.,* 418 F.Supp. 56

(N.D.Texas 1976); *General Insurance v. Stoddard Wendle Ford Motors,* 67 Wash.2d 973, 410 P.2d 904 (1966); 94 A.L.R.2d 221, 264–265.

For cases *contra,* limiting subcontractor immunity from liability, *see, Paul Tishman Co. v. Carney & Del Guidice, Inc.,* 36 A.D.2d 273, 320 N.Y.S.2d 396 (1971), *aff'd per curiam* 34 N.Y.2d 941, 359 N.Y.S.2d 561, 316 N.E.2d 875 (1974); *Employers' Fire Insurance Co. v. Behunin,* 275 F.Supp. 399 (D.Colo.1967); *McBroome-Bennett Plumbing, Inc. v. Villa France, Inc.,* 515 S.W.2d 32 (Tex.Civ.App.1974), writ. ref'd n. r. e.

11. 561 P.2d at 1213. The language "provided that subcontractors were insured 'only as regards (their) property,' and were included 'as their interests may appear.'" *Ibid.*

12. 'By accepting the premiums for [the subcontractors'] inclusion as co-insureds under said policy, the plaintiff insurance company assumed the risk of *any* loss occasioned by their negligence. (emphasis added).'

The *Baugh-Belarde* court then concluded that the builder's risk policy "protected each insured party against his own negligence, whether the property lost belonged to him or to some other insured party[,]" and that the subcontractor's limited property interest did not prevent it from being immune to insurer suit. *Ibid.* The court's policy considerations underlying its decision were extensive:

> We base our decision on several policy considerations. First, a severe conflict of interest would exist if an insurer were permitted to recover from one of its own insureds. As an insured, College Utilities was under an implied duty to cooperate fully with its insurer in its inspection of any loss covered under the policy. As part of this duty of cooperation, College Utilities was obligated to answer the questions of insurance agents concerning the facts surrounding any loss and to permit inspection of its property and equipment on the site. If the insurer were permitted to subrogate to Baugh-Belarde's claims against College Utilities, it could use College Utilities' Cooperation in the investigation of the loss to build a liability case against the insured subcontractor. Such a conflict of interest would result in a breach of the fiduciary relationship between the insurer and its insured. This danger of conflict of interest was recognized by the court in *Home Insurance Co. v. Pinski Brothers, Inc.,* 160 Mont. 219, 225–226, 500 P.2d 945, 949 (1972) in its enumeration of reasons why insurers should not be permitted to sue their own insureds:
>
> > To permit the insurer to sue its own insured for a liability covered by the insurance policy would violate these basic equity principles, as well as violate sound public policy. Such action, if permitted, would (1) allow the insurer to expend the premiums collected from its insured to secure a judgment against the same insured on a risk insured against; (2) give judicial sanction to the breach of the insurance policy by

the insurer; (3) *permit the insurer to secure information from its insured under the guise of policy provisions available for later use in the insurer's subrogation action against its own insured* ; (4) allow the insurer to take advantage of its conduct and conflict of interest with its insured; and (5) constitute judicial approval of a breach of the insurer's relationship with its own insured. (emphasis added)

A second policy reason for not permitting a builder's risk insurer to subrogate against its insured, regardless of the extent of the insured's property in the construction project, is reduction of litigation. If an insurer on a major construction job were able to recover from one or more of its insureds, most losses on construction jobs would result in costly litigation. This result is clearly not in the public interest, especially since the cost of such litigation would ultimately be passed on to the general public in the form of increased insurance premiums and higher construction costs. Our third policy consideration concerns the tremendous burden which would be placed on subcontractors in College Utilities' position if a builder's risk insurer were permitted to recover against its own insured. Each subcontractor working on a multi-million dollar project would be forced to protect against liability for loss to the entire project by paying huge premiums for his own liability insurance. Again, these higher premiums would be calculated into the subcontractors' bids and would increase the entire cost of the construction project. All three of these policy problems can be avoided by viewing the builder's risk policy as a single policy which protects each insured party against his own negligence. The entire loss should be borne by the insurer which has accepted one premium covering the entire property.

*Id.* at 1214–15 (footnote omitted).

The *Baugh-Belarde* policy considerations are echoed in *St. Paul, supra* — a case ad-

---

*Baugh-Belarde, supra* at 1214, quoting *New Amsterdam, supra* at 1020. (word omission,

punctuation, brackets, and emphasis in *Baugh-Belarde* ).

hering to the rule that an insurer may not subrogate against a coinsured of its subrogor. In this case, the relevant facts were that St. Paul issued a builder's risk policy which listed the insured as " '[the general contractor] . . . for its account and/or the account of its subcontractors,' " and which insured against " 'all risks of direct physical loss, damage or destruction . . . of property of the assured or of others in custody or control of the assured' excluding loss caused directly or indirectly by defective materials or faulty workmanship or error in design." 65 Cal.App.3d at 73, 135 Cal.Rptr. at 124 (our insertion). In addition, the policy excluded loss " 'if at the time of loss, there is other valid and collectible insurance which would attach if the insurance had not been effected.' " *Ibid.* Subcontracts gave the general contractor the option to carry builder's risk insurance and upon election, subcontractors " 'shall [should] have an interest therein as determined by contractor to the extent same covers work of the subcontract.' " *Ibid.* (our insertion). The subcontracts also obligated subcontractors to indemnify the general contractor for damage to others from failure in performance of the work; this obligation was insured by liability policies. The *St. Paul* court further observed that "apparently" the individual subcontractor damage was paid by the general contractor from St. Paul funds under coverage of the builders risk policy. *Ibid.*

On appeal from a ruling that St. Paul could not maintain a subrogation action against alleged negligent subcontractors, St. Paul, in part, contended that even though the subcontractors were listed as additional insureds under the policy for property damage only, the policy did not extend coverage to them for the loss so as to prevent subrogation, and the subcontractors were obligated under the subcontractors to indemnify the general contractor. *Id.* at 71, 135 Cal.Rptr. at 123. The California court disagreed, noting:

> The policy was obviously procured by Leavell for the mutual benefit of the subcontractors and clearly extends coverage to them as additional assureds. Fur-

thermore, there was no other valid or collectible insurance "which would attach if this insurance had not been affected" because, admittedly, the subcontractors had not obtained "other" builder's risk coverage. It is not clear that the existence of third party liability coverage is sufficient to render the other insurance exclusion effective. Such coverage would not necessarily "attach" simply because a builder's risk policy had not been obtained.

*Id.* at 74, 135 Cal.Rptr. at 125. The court also observed that the validity of the subcontractors' claims to coverage were recognized by the insurer and general contractor when the insurer paid the "total amount necessary to reimburse each for his property damage." *Ibid.* The court then added:

> It matters not that the lump sum was paid to Leavell and distributed by it to the others. That procedure appears to have been contemplated by the parties wherein Leavell was insured for "its account and/or the account of its subcontractors." Certainly St. Paul would not have made payment under the policy unless it believed itself obligated to so do or unless it did so under a reservation of rights. To do otherwise would result in its being a volunteer to whom subrogation would have to be denied on that ground. Having determined that the subcontractors were insured under the policy for the loss in question, the principle of equitable subrogation cannot be relied upon to effect recovery. St. Paul obligated itself for a substantial premium to pay this loss. Having accepted the premium and paid the loss, it would be inequitable to permit it to recoup under the guise of equitable subrogation in this case.

*Id.* at 75, 135 Cal.Rptr. at 125.

Another instructive case relative to the contentions of the parties here is *Board of Education v. Hales, supra.* Under facts similar to those in the instant case, a school board's insurance carriers brought an action in the name of the school board against allegedly negligent subcontractors, claiming

repayment for all loss except the amount paid the subcontractors. The school board had contracted with a general contractor for the construction of a high school; as part of the agreement, the school board obtained builder's risk insurance, covering the value of materials and property on the site during the construction, and insuring the interests therein of the school board, the general contractors, and subcontractors. The trial court entered summary judgment for the subcontractors.

The school board on appeal did not contend that the subcontractors' property was not insured under the policies, but rather, that the builder's risk insurance insured the loss of *property* only and not the *liability* any insured party may have for loss. In submitting that the insurer may recover amounts paid to insureds other than the subcontractors for property losses caused by the subcontractors' negligence, the school board relied on *Paul Tishma, Behunin,* and *McBroome-Bennett,* all *supra* at note 10, cases which South Tippecanoe likewise argues. *Hales,* though, noted that, "These seem to be the only courts in the United States which so hold, and we are not persuaded by their reasoning[.]" 566 P.2d at 1247, and then stated:

> It occurs to us that all fire insurance is of the "property" type rather than the "liability" type. Yet courts have consistently held that where an insurance company attempts to recover, as a subrogee, from a coinsured generally covered under a fire insurance policy, the action must fail in the absence of design or fraud on the part of the coinsured. Fire loss is nearly always caused by negligence. . .

> .    .    .    .    ..

An insurer which accepts a premium based partially on the inclusion of a coinsured under a policy of insurance has assumed the risk of its negligence. We agree with the reasoning of Mr. Justice Guittard, in his dissenting opinion in the *McBroome* case, *supra*:

> The insurer, which has accepted one premium covering the entire property

and has assumed the risk of the negligence of each insured party, ought not to be allowed to shift the risk to any one of them. [515 S.W.2d p. 44].

*Id.* at 1247–48 (footnote omitted, brackets in *Hales*).

The construction contract in the next case of interest, *Midwest Lumber, supra,* contained this provision: "'Contractor shall provide public liability insurance which shall be a non-reimbursable item. Builders risk or fire and extended insurance coverage shall be provided and paid for by the Owner.'" 196 N.W.2d at 378. The court was faced with the question whether the contractor and owner intended that the builders risk or the fire and extended coverage insurance covered only the risks of the owner or of both. The builder had brought an action (subrogation claim) against the contractor for damages sustained during the course of construction due to alleged negligence, and the lower court ruled in favor of the defendant contractor.

In concluding that the parties intended to cover the risks of both and thus the owner could not recover from the contractor, the Nebraska Supreme Court wrote, in part:

> It is apparent therefore that when the parties entered into the contract both had interest to protect against loss. It is evident that if each was interested only in protecting himself from loss each could have purchased his own insurance and he need not have consulted the other about it. The reason for including a specific provision for "Builders risk or fire and extended coverage insurance    .    .    . paid for by the Onwer" [sic] could be only to protect the separate interest of both parties and to determine how the cost thereof was to be paid. Under the terms of this construction contract the cost of the insurance was to be paid by the owner rather than included in the costs of the contractor and then charged back to the owner as part of the contract price.

*Id.* at 379.

We conclude our survey of instructive and representative cases with *Commerce and Industry Insurance Co. v. Orth, supra.*

In *Orth*, the insurance company paid an apartment owner's claim for a windstorm loss sustained while a building was under construction and then sought to recover damages against the general contractor and roofing subcontractors for alleged negligence in roof installation. The owner-general contractor construction agreement required the owner to carry insurance to protect the work during construction against loss by fire, windstorm, hail, and other hazards that, according to the *Orth* court, were "ordinarily included in a standard extended coverage endorsement." 458 P.2d at 927. The agreement also included this paragraph:

> '* * * The Owner, Contractor, and all subcontractors waive all rights, each against the others, for damages caused by fire or other perils covered by insurance provided under the terms of this article, except such rights as they may have to the proceeds of insurance held by the Owner as Trustee.'

*Id.* at 927–28. The policy at issue had this additional clause: " 'Without prejudice to this insurance the insured may, prior to loss, release others from liability for loss to the described property from whatever cause arising * * *.' " [13] *Id.* at 928.

In examining the subrogation issue raised by these provisions, the court stated:

> The apparent purpose of the "waiver" provision of the construction agreement, coupled with the requirement that the owner furnish insurance, was to shift from the owner and the contractor to the insurer the risk of loss from the named perils, including windstorm. The owner's agreement to "waive all rights" against the contractor and subcontractors was intended to benefit the contractor. But because it eliminated the possibility of subrogation, the agreement enhanced the risk of the insurer.
>
> In a clause that the insurer drafted, however, the insurer accepted the above-described risk by expressly allowing the insured owner to release the contractors "from liability for loss to the described premises from whatever cause arising." The insurer thereby agreed to compensate the owner for designated losses for which subrogation would not be available. Presumably the insurer calculated its premiums accordingly.

*Ibid.* The court goes on to answer the insurer's argument that the waiver provision in the construction agreement was not sufficiently definite to protect a contractor against his own negligence:

> On the record in this case, it is not harsh to hold that the insurer waived its subrogation rights against the various contractors; we are merely recognizing the bargain made between the insurer and the owner. The owner and the contractor had agreed that the owner would furnish the insurance and would not look to the contractors for recovery for losses covered by insurance. The insurer accepted the situation thus created. An insurance scheme allowing the insurer to bring subrogation actions against contractors would defeat the purpose of the construction contract and would be inconsistent with the terms of the policy.
>
> .    .    .    .    .
>
> The purpose of the insurance policy was to protect the owner and the various contractors until the entire project was completed. The waivers of liability were intended to release the contractors from liability to the owner for insured losses during the entire period of construction.
>
> The total effect of all the contracts was to distribute the risks incidental to construction to an insurance carrier, who agreed in effect to protect all the contracting parties without the right of subrogation against any of them.

*Id.* at 929.

Although we have decided to follow this line of authority, we have not fully disposed of this appeal. We next must test whether vis-a-vis the contract provisions the individual Defendants are "insureds" and whether the 11.3.6 and 5.3.1.5 waiver operates so as to deny subrogation.

---

**13.** Compare the "XV. SUBROGATION" language herein.

Defendant Shambaugh's status as a subcontractor to the general contractor is conceded by South Tippecanoe in its brief. Therefore, consistent with our earlier views, Shambaugh is an intended "insured" under the builder's risk insurance and hence may not be subject to subrogation; in addition, subrogation rights have been waived against Shambaugh.

Defendant Monitor's contract with Tippecanoe School Corporation, South Tippecanoe's alter ego, identifies Monitor as the "Contractor" and expressly incorporates the General Conditions. Thus, vis-a-vis the contract documents, Monitor's interest were insured by the owner's subrogee and subrogation will not lie; South Tippecanoe also waived rights to recover any damages against Monitor. Even if Monitor were characterized as a subcontractor, the result would be the same.

With respect to Defendant Shaver, South Tippecanoe urges that the architects' claim of protection under the 11.3.6 waiver provision is "contrary to the plain meaning of the language used." We disagree. Even though the last sentence of 11.3.6 is not a model of draftmanship, it is clear from a reading of all the provisions that the architects' interests were to be covered by the property insurance; that is, when 11.3.6 is taken into consideration, 11.3.1 essentially reads that, "This insurance shall include the interests of the Owner [his employees and the Architect and his employees as the Owner's representative]," etc. It only makes sense that the architects would not waive rights of recovery unless its interests were included under the builder's risk insurance. Inasmuch as Shaver's interests were included in the insurance, Shaver may not be subject to subrogation.

As to Defendant Akers, South Tippecanoe argues that "the record is wholly insufficient to establish its status as subcontractor or sub-subcontractor," and thus the "waiver argument . . . has no application to . . . Akers whose role at the construction site was merely that of materi-

alman." Although Akers may have variously described itself,[14] we think it clear with semantic differences aside that Akers's property interests should be among those considered covered under 11.3.1 of the General Conditions. We do not view any difficulty associated with the labeling of Akers's status as raising to fore a genuine issue of material fact regarding Akers's coverage interest. As an "insured", and with South Tippecanoe's waiver operating in his favor, Akers may not be subrogated against.

As a final matter, we note that South Tippecanoe generally avers in its brief that:

Numerous issues exist in which, for defendants' subrogation or waiver arguments to be considered, matters must be determined in which there are genuine issues of fact precluding summary judgment.

The intentions of the parties, both as to immunity from builders' risk subrogation and as to contractual waiver, cannot be conclusively determined in their favor from the record as a matter of law. The related issues of custom, practice and trade usage, both in the field of insurance and in the construction industry, requires recourse to evidence about which there are genuine issues of fact.

The "logical extension," [15] however, of the contract rules of construction (recited at pages 325, 326 of this opinion) is the parol evidence rule which states "that in the absence of fraud, mistake, ambiguity, illegality, duress or undue influence, extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction." *Hauck v. Second National Bank of Richmond,* (1972) 153 Ind.App. 245, 260, 286 N.E.2d 852, 861, and cases cited therein. And it has also been said that when terms of a written agreement are plain and clear on the face of the document, they are conclusive. *Albert Johann & Sons Co. v.*

14. See: Appendix B.

15. *Hauck, infra,* 153 Ind.App. at 260, 286 N.E.2d at 861.

*Echols,* (1968) 143 Ind.App. 122, 238 N.E.2d 685. In view of our earlier statements holding the controverted contract provisions to be unambiguous and dispositive of the relationships of the parties, we believe any issue(s) raised by the South Tippecanoe assertion above have been adequately decided against South Tippecanoe.

There existing no genuine issue of material fact in this case, the Defendants' motions for summary judgment were properly granted and we affirm the trial court's entry of final judgment.

The trial court's judgment is also affirmed with respect to the $1000 deductible which South Tippecanoe had under the builder's risk policy. Inasmuch as 11.3.1 required the Owner to secure insurance on the Work to the "full insurable value thereof," South Tippecanoe became the insurer of the other contracting parties to the extent of the deductible. *See Midwest Lumber, supra* 196 N.W.2d at 379. Similarly, in *Morsches* the court said, after noting that the plaintiff Probst was limited in recovery to the proceeds of the policy (which covered 75 percent of his loss), "The fact that he failed to take out a policy sufficient to cover the cost of the undertaking is a cost he will have to bear." 388 N.E.2d at 287.

Affirmed.

LOWDERMILK, P. J., and GARRARD, P. J. (sitting by designation), concur.

### APPENDIX A

#### 11.1 CONTRACTOR'S LIABILITY INSURANCE

11.1 The Contractor shall purchase and maintain in a company or companies to which the Owner has no reasonable objection such insurance as will protect him from claims set forth below which may arise out of or result from the Contractor's operations under the Contract, whether such operations be by himself or by any subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1 claims under workmen's compensation, disability benefit and other similar employee benefit acts;

.2 claims for damages because of bodily injury, occupational sickness of disease, or death of his employees;

.3 claims for damages because of bodily injury, sickness or disease, or death of any person other than his employees;

.4 claims for damages insured by usual personal injury liability coverage which are sustained (1) by any person as a result of an offense directly or indirectly related to the employment of such person by the Contractor, or (2) by any other person; and

.5 claims for damages because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6 liability insurance shall include all major divisions of coverage and be on a comprehensive general basis including:

1. Premises—Operations (including X–C–U)

2. Contractor's Protective (Independent Contractors)

3. Products and Completed Operations

4. Contractual—including specific provision for the contractor's obligations under Paragraph 4.18

5. Elevators

6. Owned and non-owned motor vehicles

7. Owned and non-owned aircraft.

11.1.2 The insurance required by Subparagraph 11.1.1 shall be written for not less than any limits of liability required by law or by those set forth below, whichever is greater, and shall include contractual liability insurance as applicable to the contractor's obligations under Paragraph 4.18. During the term of the contract, the Contractor and each Sub-contractor shall, at their own expense, purchase and maintain the following insurance in companies properly licensed and satisfactory to Owner.

A. Workmen's Compensation including occupational disease, and Employer's Liability Insurance.

Statutory—amounts and coverage as required for the state where the project is located and such adjoining states as required by contractor's operations.

Employer's Liability $100,000.00.

B. Comprehensive General Liability Insurance—The Contractor shall maintain a Comprehensive General Liability Form of Insurance with bodily injury of not less than $500,000.00 for any one (1) person in any one occurrence and $1,000,000.00 for two (2) or more persons in any one occurrence and with property damage liability limits of $500,000.00 in any one occurrence. The insurance policy shall include the following:

1) Premises Operations—The policy shall include coverage for the following special hazards when applicable to the project:

Property damage arising out of blasting or explosion.

Property damage arising out of collapse of or structural injury to any building or structure due to the grading of land, excavation, burrowing, filling, backfilling, tunneling, pile driving, cofferdam work or caisson work or to moving, shoring, underpinning, raising or demolition of any building or structural or removal or rebuilding of any structural support thereof.

Injury to or destruction of wires, conduits, pipes, mains, sewers and other similar property or any apparatus in connection therewith below the surface of the ground, if caused by use of mechanical equipment.

2) The policy shall include Contractor's Protective Liability on a "blanket" basis to cover the operations of any sub-contractors.

3) Contractor shall carry Completed Operations Insurance with limits as herein specified for at least one (1) year following completion of work.

4) The policy shall include "Broad Form Property Damage Coverage."

C. Automobile Liability Insurance—The Contractor shall maintain Comprehensive Automobile Liability Insurance with bodily injury liability limits of not less than $500,000.00 for any one (1) person in any one occurrence and $1,000,000.00 for two (2) or more persons in any one occurrence. Property damage liability insurance shall be maintained with limits of not less than $500,000.00 for any one occurrence. This coverage may be provided either as a separate policy or as a part of the comprehensive general liability form of policy described previously. The automobile insurance must include coverage for all owned, non-owned and hired vehicles.

## 11.2 OWNER'S LIABILITY INSURANCE

11.2.1 The Owner shall be responsible for purchasing and maintaining his own liability insurance and, at his option, may purchase and maintain such insurance as will protect him against claims which may arise from operations under the Contract.

.

## APPENDIX B

I. e., subcontractor and materialman (answer to interrogatories); sub-subcontractor (response to admissions). The response to South Tippecanoe's request for production included a letter to Shambaugh confirming a price quotation for certain LP gas equipment and service and other invoices, memoranda, and correspondence with Shambaugh.

Akers correctly points out that in South Tippecanoe's memorandum in support of plaintiff's motion for partial summary judgment and in opposition to defendants' motions for summary judgment, South Tippecanoe stated that:

The relationship of the defendants and principal parties was:

.     .     .     .     .

7. Paul Akers, Inc.,—Subcontractor under contract with Kettlehut.

Responding in its reply brief, South Tippecanoe, in part, states:

This was merely Plaintiff's attempt to give the trial court an approximate iden-

tification of the multiple parties so that it might better understand the argument to follow. The erroneous characterization of Akers as a subcontractor does not preclude Plaintiff-Appellant from requiring that there be no genuine issues of material fact before granting summary judgment.

We should also note that in the reply brief, South Tippecanoe "characterizes" Akers as "supplier."