BEST FRIENDS PET CARE, INC. *v.* DESIGN
LEARNED, INC., ET AL.
(AC 23330)

Lavery, C. J., and Bishop and Peters, Js.

168

Argued February 24—officially released June 3, 2003

*Stuart G. Blackburn*, with whom, on the brief, was *Margaret Ralphs*, for the appellant (plaintiff).

*Barbara A. Frederick*, with whom, on the brief, were *Donald W. Doeg* and *John B. Kennelly*, for the appellee (named defendant).

*Opinion*

BISHOP, J. This is an appeal from the summary judgment rendered by the trial court in favor of the defendant Design Learned, Inc. (Design Learned), in an action for negligence.[1] The plaintiff, Best Friends Pet Care, Inc. (Best Friends),[2] raises several claims on appeal, all of which concern the applicability of a waiver of subrogation clause in a construction contract. We affirm in part and reverse in part the judgment of the trial court.

From the pleadings and materials filed in conjunction with the motion for summary judgment, the following undisputed facts emerge. Best Friends was the owner and operator of a chain of pet care facilities, including one that was under construction in Rocky Hill. The project in Rocky Hill was undertaken pursuant to a construction management agreement (contract) between Best Friends and the construction manager, Highland Management Associates, Inc. (Highland). The contract, which was a standard American Institute of Architects (AIA) contract, contained a waiver of subrogation clause stating in relevant part that Best Friends and Highland "waive all rights against each other and against the Contractors, Architect, consultants, agents and employees of any of them, for damages, but only to the extent covered by property insurance . . . ." Design Learned had been retained by Highland as a consultant pursuant to an agreement between itself and

---

[1] The trial court also rendered summary judgment in favor of the defendant American Standard Companies, Inc. The plaintiff does not appeal from that portion of the judgment.

[2] We note that Best Friends, as the plaintiff, is acting on behalf of the real party in interest, the Hartford Insurance Company, who is the subrogee in this action.

Highland, whereby Design Learned would provide design consulting services for the Best Friends project.

On January 12, 1998, while still under construction, the Rocky Hill facility was consumed by fire and destroyed. Best Friends alleges that the fire started because the boiler was not installed with the proper clearance from the flooring, which ignited. The Hartford Insurance Company (the Hartford), which was the insurer of Best Friends, reimbursed Best Friends for the loss, which included $1,049,000 for damage to the building, $446,739 for loss of income resulting from loss of use of the building and $77,714.30 for damage to personal property.

Best Friends brought this subrogation action against several of Highland's contractors and consultants, including the defendants American Standard Companies, Inc., a contractor, and Design Learned. Those defendants filed motions for summary judgment on the theory that the contract between Best Friends and Highland contained a valid waiver of subrogation clause that foreclosed the possibility of Best Friends' instituting a subrogation action against either contractors or consultants. Best Friends argued that General Statutes (Rev. to 1997) § 52-572k made void waiver of subrogation provisions in construction contracts. It also argued that the waiver would be inapplicable to Design Learned in any event because, inter alia, Highland had failed to obtain a similar waiver from Design Learned in their agreement.

The court granted the motions for summary judgment in favor of both defendants. Best Friends challenges only the granting of the motion in favor of Design Learned. It makes the following claims: (1) that the waiver of subrogation clause is void pursuant to § 52-572k; (2) that the allegedly negligent conduct by Design Learned predated and was outside the scope of the

contract; (3) that Design Learned forfeited the protection of the contract by not including a waiver of subrogation provision in its own agreement with Highland; and (4) that neither personal property loss nor loss of use are within the scope of the waiver. We affirm the judgment of the trial court on all but the last claim.

## I

The threshold question and a question of first impression for this court concerns the effect of § 52-572k[3] (statute) on the waiver of subrogation provision in this standard AIA contract. We note that "[i]n general, whether conduct falls within a statute's province is a matter of statutory construction, and presents a question of law warranting plenary review." *Sandella* v. *Dick Corp.*, 53 Conn. App. 213, 226, 729 A.2d 813, cert. denied, 249 Conn. 926, 733 A.2d 849 (1999).

In essence, the question we must answer to dispose of the first claim is whether the waiver of subrogation clause is, effectively, a hold harmless or indemnification provision, as those terms are used by the statute. A closer examination of the AIA contract and the statute is required for that discussion.

We begin with a look at the AIA contract, AIA Document B801/CMa,[4] which explicitly incorporates AIA

[3] General Statutes (Rev. to 1997) § 52-572k (a) provides: "Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of such promisee, his agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insurer."

[4] The full title of the main contract is "AIA Document B801/CMa Standard Form of Agreement Between Owner and Construction Manager, 1992 Edition." It incorporates on page one the 1992 editions of AIA Documents B141/CMa, A101/CMa and A201/CMa.

Document A201/CMa. Section 10.4 of B801/CMa, entitled "Waivers of Subrogation," states in relevant part that "[t]he Owner and Construction Manager waive all rights against each other and against the Contractors, Architect, consultants, agents and employees of any of them, for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201/CMa . . . ."[5] The property insurance provision, § 11.3, of A201/CMa requires that the owner purchase property insurance "for the entire Work at the site on a replacement cost basis . . . ." Section 11.1.1 of B801/CMa requires the construction manager to purchase insurance, inter alia, to cover all workers compensation and other claims for personal injury at the site.

General Statutes (Rev. to 1997) § 52-572k (a) provides in relevant part: "Any . . . agreement . . . entered into in connection with or collateral to a contract or agreement relative to the construction . . . of any building, structure or appurtenances thereto . . . that purports to indemnify or hold harmless the promisee against liability for . . . damage to property caused by or resulting from the sole negligence of such promisee, his agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation

---

[5] The entire clause states: "Waivers of Subrogation. The Owner and Construction Manager waive all rights against each other and against the Contractors, Architect, consultants, agents and employees of any of them, for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201/CMa, General Conditions of the Contract for Construction, Construction Manager-Adviser Edition, current as of the date of this Agreement. The Owner and Construction Manager each shall require similar waivers from their Contractors, Architect, consultants, agents, and persons or entities awarded separate contracts administered under the Owner's own forces."

agreement or other agreement issued by a licensed insurer."

The first question for our consideration is whether the previously described provisions of the contract fall within the contours of the statute. In interpreting the statute, "we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity." (Citation omitted; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (en banc).

From the language of the statute, it is unclear whether the waiver of subrogation in the AIA contract reasonably can be viewed as a provision to hold harmless or to indemnify, as those terms are used in the statute. Similarly, our review of the legislative history of the statute provides us with no guidance on whether waivers such as the type just described are within the scope of the statute.

Although this court has never addressed the question of the applicability of the statute to an AIA contract waiver of subrogation clause,[6] because the AIA contract is used nationally, and other states have enacted statutes (or follow common law) similar to § 52-572k, the question has been addressed elsewhere. In the absence of a pointed legislative history, we find useful a review

[6] But see *Maryland Casualty Co.* v. *Trane Co.*, 46 Conn. Sup. 172, 742 A.2d 444 (1999), in which the court found a waiver of subrogation provision in a construction contract to be valid against the insurance company subrogee. The court did not address the impact of General Statutes § 52-572k on the waiver provision.

of those decisions from other jurisdictions construing similar statutes and assessing their applicability to the standard AIA waiver of subrogation provision.

Of particular note is *Ralph Korte Construction Co. v. Springfield Mechanical Co.*, 54 Ill. App. 3d 445, 369 N.E.2d 561 (1977), in which the Illinois Appellate Court interpreted an Illinois statute that was nearly identical to § 52-572k as it related to a waiver of subrogation clause in a construction contract.[7] There, the court found that the purpose of the statute was to protect workers and the public from injury, and to keep " 'persons having charge of the work' "; id., 446; from avoiding liability or shunting it onto contractors or subcontractors. The court concluded that "the parties had agreed, in effect, to assume the risk of loss as between themselves due to fire or other perils, to the extent each party was covered by insurance. . . . Both sides benefit from the arrangement and such benefit . . . does not come at the expense of a third party." Id., 447.

New York courts, interpreting a similarly worded statute, also have held that waiver of subrogation provisions are not within its purview. In *Board of Education v. Valden Associates, Inc.*, 46 N.Y.2d 653, 389 N.E.2d 798, 416 N.Y.S.2d 202 (1979), the New York Court of Appeals weighed the effect of § 5-323 of New York's General Obligations Law, which proscribed contractual exemptions for liability in construction contracts, on contractual provisions that waived all rights to recovery to the extent of insurance coverage. The court found that "[a] distinction must be drawn between contractual provisions which seek to exempt a party from liability

---

[7] The Illinois statute provides in relevant part: "With respect to contracts or agreements, either public or private, for the construction . . . of a building . . . every covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void against public policy and wholly unenforceable." Ill. Rev. Stat. 1975, c. 29, para. 61, now 740 Ill. Comp. Stat. Ann. 35/1, § 1 (West 2001).

to persons who have been injured . . . and contractual provisions . . . which in effect simply require one of the parties to the contract to provide insurance for all of the parties." Id., 657; see also *Trump-Equitable Fifth Avenue Co.* v. *H.R.H. Construction Corp.*, 106 App. Div. 2d 242, 485 N.Y.S.2d 65, aff'd, 66 N.Y.2d 779, 488 N.E.2d 115, 497 N.Y.S.2d 369 (1985).

Ultimately, we find persuasive, as did the trial court, the distinction made by the New Hampshire Supreme Court in *Chadwick* v. *CSI, Ltd.*, 137 N.H. 515, 629 A.2d 820 (1993). In *Chadwick*, the court distinguished between exculpatory provisions, which were forbidden by New Hampshire common law, and allocation of risk provisions, such as the kind found in the AIA contract. Id., 523. "These [AIA provisions] do not present the same concerns as naked exculpatory provisions. As opposed to exculpatory provisions . . . the insurance provisions of the standard AIA contract are not designed to unilaterally relieve one party from the effects of its future negligence, thereby foreclosing another party's avenue of recovery. Instead, they work to ensure that injuries or damage incurred during the construction project are covered by the appropriate types and limits of insurance, and that the costs of that coverage are appropriately allocated among the parties." (Citations omitted.) Id.; see also *Behr* v. *Hook*, 173 Vt. 122, 128, 787 A.2d 499 (2001) (upholding waiver of subrogation provision in AIA contract).

We agree that this arrangement embedded in the AIA contract to share the risks and the obligation of insuring the persons and property at the site does not fit the description of an agreement to hold harmless or to indemnify. Having concluded that the statute does not render as void a waiver of subrogation provision when coupled with agreements to allocate the cost and responsibility of insurance, as is the case with this stan-

dard AIA contract, we further conclude that the plaintiff's first claim is without merit.

## II

The resolution of the remainder of the claims depends on a closer examination of the contract. We note the standard of review. If contract language is definitive of the parties' intent, then the interpretation of the language becomes a question of law for the court. *B & D Associates, Inc.* v. *Russell*, 73 Conn. App. 66, 71, 807 A.2d 1001 (2002). Additionally, a presumption that the language is definitive arises when, as here, the contract is between sophisticated parties and commercial in nature. Id. Our review, in such a case, is plenary. Id.

If, however, the language is not clear, then the intention of the parties as represented in the contract becomes a question of fact. Id. If the fact in question is genuinely material to the resolution of the issue, then it is not the proper subject of summary judgment. In considering a motion for summary judgment, the function of the court is to determine whether any material fact is in dispute, not to make factual findings. See *Golden* v. *Johnson Memorial Hospital, Inc.*, 66 Conn. App. 518, 522–23, 785 A.2d 234, cert. denied, 259 Conn. 902, 789 A.2d 990 (2001). "On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Internal quotation marks omitted.) *Tarnowsky* v. *Socci*, 75 Conn. App. 560, 564, 816 A.2d 728 (2003). In the determination of whether summary judgment was properly granted, our review is, again, plenary. Id.

## A

Best Friends claims that the allegedly negligent conduct by Design Learned predated the signing of the

contract between Highland and Best Friends, was outside the scope of the contract and, therefore, should not receive the benefit of the waiver of subrogation clause found in the contract. Unfortunately for Best Friends, the waiver of subrogation provision on which Design Learned relies, and that we have found to be applicable, makes no reference to the timing of the work, or the timing of the hiring, or anything but the status of Design Learned as consultant. Specifically, the contract states that "[t]he Owner and Construction Manager waive all rights against each other and against . . . consultants . . . for damages . . . ."

Design Learned was hired by Highland prior to the signing of the contract between Highland and Best Friends, and engaged in work as a consultant for Highland from that time on. The only agreement that Design Learned had, relative to the project, was with Highland. The court determined that the dispositive question in that regard, therefore, was whether the contract between Highland and Best Friends engaged Highland to do the work for which Best Friends was claiming Design Learned was negligent. Best Friends claims that some of the services that Design Learned provided for Highland, in particular the consultation on prototype facilities, should be severable from those services for which the contract, with its waiver of subrogation provision, constituted the agreement.[8]

The plain language of the agreement, however, provides little room for that result: The contract is broadly

---

[8] To the extent that Design Learned's allegedly negligently prepared drawings could be used (or have been used) in the construction of other facilities, Best Friends has made no such showing, nor has it made any showing of a secondary agreement between Best Friends and Highland that might encompass Design Learned's work. As Design Learned points out in its brief, the complaint "is explicitly predicated on the proposition that the design work that [Design Learned] performed for Highland not only was incorporated into the facility, but also was the cause of the fire that destroyed the facility." Any other work that Design Learned might have done for Highland, in short, is irrelevant.

inclusive of the labor for which Highland was hired. "The Contract represents the entire and integrated agreement between the parties hereto and supercedes prior negotiations, representations or agreements, either written or oral." As defined by the contract, " '[w]ork' means the construction and services required by the [c]ontract . . . whether completed or partially completed, and includes all[9] other labor, materials, equipment and services provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or part of the Project." Further, "[t]he Project is the total construction of which the Work performed under the [c]ontract . . . may be the whole or a part . . . ." Finally, "drawings" are defined as "the graphic and pictorial portions of the Contract Documents, wherever located and *whenever issued* . . . ." (Emphasis added.)

"In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *B & D Associates, Inc.* v. *Russell,* supra, 73 Conn. App. 71.

We agree with the court that the work provided by Design Learned for Highland, which is the subject of this action, was "clearly within the construction manager's obligations under the [contract]." We conclude, there-

---

[9] As this court has stated: "There cannot be any broader classification than the word all." (Internal quotation marks omitted.) *Burkle* v. *Car & Truck Leasing Co.,* 1 Conn. App. 54, 56, 467 A.2d 1255 (1983).

fore, that the court properly found from the unambiguous language of the contract that Design Learned was a consultant, subject to the waiver of subrogation provision.

## B

Best Friends next claims that Design Learned cannot enjoy the benefits of the waiver of subrogation provision because no waiver of subrogation provision was included in the agreement between itself and Highland, as required by the contract. It is uncontested that the agreement between Design Learned and Highland contained no such waiver.

The disposition of Best Friends' claim revolves around a determination of the parties' intent as to the purpose of the waiver of subrogation provision.[10] The waiver of subrogation provision in the contract is comprised of two sentences. The first provides in relevant part that "[t]he Owner and Construction Manager waive all rights against each other and against the Contractors, Architect, consultants, agents and employees of any of them, for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in [the contract documents] . . . ." The second sentence provides, in relevant part, that "[t]he Owner and Construction Manager shall each require similar waivers from their Contractors, Architect, consultants, agents, and persons or entities awarded separate contracts . . . ."

As previously discussed, the court determined, and we agree, that the purpose of the waiver of subrogation provision was, in conjunction with the other contractual provisions, to allocate risks and costs among the parties to the contract. The first sentence of the waiver evinces

---

[10] We note that Design Learned is not a party to the contract.

the clear intent that the parties waive all rights against each other and their consultants, *but only* to the extent covered by property insurance, *except such rights* as they may have to the proceeds of the insurance. Here, the principle expressio unius est exclusio alterius[11] is of some assistance. Had the parties wanted to make the waiver referenced in the first sentence contingent on the parties' obtaining waivers from their consultants, then the proper place for that requirement would have been alongside the conditionals in the first sentence.[12]

Examining the purpose of the waiver of subrogation, we further note that the failure of Highland to obtain a waiver of subrogation provision from Design Learned does not thwart the intent of the parties to the contract.[13] The court found that the clearly expressed intent of the contract was that parties to the contract waive all subrogation claims against each other and their consultants. Additionally, it found that the absence of a similar agreement between Highland and Design Learned does not obscure that clarity, nor does its absence "affect the validity of the waiver provision in the [contract] between Best Friends and Highland." We agree with the court.

C

Best Friends' final claim is, essentially, that the definition of property insurance, as used in the waiver of subrogation provision, does not include insurance either for personal property or for loss of use. After the fire that destroyed the facility, the Hartford paid

---

[11] The expression of one thing is the exclusion of another.

[12] The court in *Behr* v. *Hook,* supra, 173 Vt. 130, came to the same conclusion in interpreting the AIA waiver of subrogation provision. "[T]he contract does not make obtaining the waivers from subcontractors a condition precedent to application of the waiver of subrogation provision." Id.

[13] In the hypothetical situation that it could have bearing, the proper action would be for breach of contract, and, as noted, Design Learned is not a party to the contract in question. See *Behr* v. *Hook,* supra, 173 Vt. 130.

Best Friends for the loss pursuant to its insurance policy. Specifically, the Hartford paid $1,049,000 for damage to the building, $446,739 for loss of income resulting from damage to the building and $77,714.30 for damage to personal property.[14]

Again, we turn to the language of the contract. The relevant language in the waiver of subrogation clause provides that "[t]he Owner and Construction Manager waive all rights against each other and against the Contractors, Architect, consultants, agents and employees of any of them, for damages, but *only to the extent covered by property insurance during construction*, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201/Cma . . . ." (Emphasis added.) Although property insurance is not explicitly defined in B801/CMa, reference to A201/CMa is helpful.[15] Indeed, A210/CMa dedicates an entire section to the topic of property insurance.

Section 11.3.1 of A201/CMa requires the owner to purchase property insurance "for the entire [w]ork at the site on a replacement cost basis . . . ." Section 11.3.1.1 states in relevant part: "Property insurance shall

---

[14] Best Friends, as subrogor, also claims that because the waiver of subrogation applies only "to the extent covered by property insurance," Best Friends can recover the $5000 deductible it was not paid. We note that recovery for the deductible was not specifically pleaded, nor is there any evidence in the record why the Hartford should recover for the deductible paid by Best Friends, i.e., ostensibly more than the Hartford itself actually paid. Accordingly, we decline to address that claim. "[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 441 n.6, 816 A.2d 673 (2003).

[15] As we already have stated, B801/CMa explicitly incorporates A201/CMa. Additionally, § 10.2 of B801/CMa provides that the "[t]erms in this [a]greement shall have the same meaning as those in . . . A201/CMa . . . ."

be on an 'all-risk' policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition . . . ." Section 11.3.1.4 states that "this property insurance shall cover portions of the [w]ork stored off the site . . . and also portions of the [work] in transit."

The term property insurance, then, is meant to protect property that can be moved, stored off-site and stolen. Those mobile attributes are most typically the features of tangible, personal property.[16] In § 11.3.1.5, an exception is made for personal property such as machinery, tools and equipment owned or rented by the contractor: Such personal property is not to be covered by the property insurance as it is defined in the contract. If the parties intended that *no* personal property was to be covered by the property insurance, then that provision would be redundant.

Our policy is to interpret contract language in accordance with a fair and reasonable construction of the written words given their common, natural and ordinary meaning when we can sensibly do so. *Southington* v. *Commercial Union Ins. Co.*, 71 Conn. App. 715, 725–26, 805 A.2d 76 (2002). Here, we can do so, and we conclude, as did the court, that the term property insurance, as used in the contract, embraces insurance for both real and personal property.

Our final inquiry is whether the same language described previously also is meant to include insurance for *loss of use* of the personal and real property. We believe that it does not. By the same lights that we have concluded that the term property insurance includes

---

[16] In fact, personal property is defined as "[m]oney, goods, and movable chattels." Ballentine's Law Dictionary (3d Ed. 1969).

tangible personal property, we find no indication that it is meant to include intangible property such as reimbursement for loss of use. That distinction was drawn in *B & D Associates, Inc.* v. *Russell,* supra, 73 Conn. App. 74, in which this court concluded that property that could be " 'stored, used, maintained or kept on the . . . premises' " necessarily was tangible property. "Economic loss, including lost business profits, is intangible, speculative in nature and certainly cannot be stored, used, maintained or kept on any premises." Id. We find no indication that the term property insurance was intended to encompass intangibles; to the contrary, the contract language refers specifically to "physical loss."

Furthermore, the contract expressly addresses the matter of loss of use insurance. Section 11.3.3 of A210/ CMa, entitled Loss of Use Insurance, states in relevant part that "[t]he owner, at the [o]wner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner *waives all rights of action against the Contractor* for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused." (Emphasis added.)

In contrast to the waiver of subrogation provision § 10.4 in B801/CMa, in which the parties to the contract waive all rights against each other and the "Contractors, Architect, consultants, agents and employees of any of them"[17] to the extent covered by property insurance, the loss of use provision is far more restrictive. Here, solely for rights of action for loss of use, the owner waives its rights only against "the Contractor."

---

[17] In the waiver of subrogation provision of § 11.3.7 in A210/CMa, the list additionally includes the construction manager, the owner's other contractors, subcontractors and sub-subcontractors.

We find it instructive to our analysis that the term "contractor" is used differentially within the contract. The contractor, in the singular, is defined as the contractor identified as such in the contract. As the contract in question is between the owner and construction manager, no specific contractor is identified. Contractors, in the plural, are defined in A201/CMa as "persons or entities who *perform construction* under Conditions of the Contract." (Emphasis added.) Significantly, subcontractors are defined differently as persons or entities that have "a direct contract with the Contractor to *perform a portion of the work* at the site." (Emphasis added.) Sub-subcontractors also are separately defined. No definition is provided for consultants.[18]

Plainly, the terms consultant and contractor are not used interchangeably in the contract. Given the broad reach of language of the principal waiver of subrogation clause, if the parties had intended the provision regarding loss of use to pertain to an equally broad spectrum of actors, the parties readily could have formulated language to accomplish that goal.

We note, also, that in the complaint, Best Friends alleged that Design Learned "was engaged in the business of . . . engineering consulting and design consulting." In Design Learned's memorandum of law in support of its motion for summary judgment, it asserts that it "provided consulting services to Highland on the [Best Friends] project pursuant to the agreement between [Design Learned] and Highland. . . ." It appears undisputed, therefore, that the parties herein and the contracting entities considered Design Learned to be a consultant and not a contractor.

The court found that the waiver of subrogation in the contract precluded Best Friends from maintaining

[18] By those definitions, Design Learned could not be considered a contractor, as it has not performed construction. Although, arguably, it could be considered a subcontractor, we need not reach that question.

its action against Design Learned as a matter of law. While we agree that the action is foreclosed as to recovery for lost property to the extent covered by property insurance, we disagree that, as a matter of law, an action for recovery for loss of use of the property similarly is foreclosed.

The judgment is reversed only as it relates to the claim that Design Learned negligently caused Best Friends to lose business profits and the case is remanded for further proceedings consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.