

**FILED**

Oct 31 2017, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Richard T. Mullineaux
Crystal G. Rowe
Alyssa C.B. Cochran
Kightlinger & Gray, LLP
New Albany, Indiana

ATTORNEY FOR APPELLEE

Peter S. Kovacs
Peter Kovacs Law PC
Fishers, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Performance Services, Inc., an
Indiana Corporation and
Huntingburg Machine Works,
Inc., an Indiana Corporation,

*Appellants-Defendants,*

v.

Hanover Insurance Company, as
Subrogee of the Southwest
Dubois County Schools,

*Appellee-Plaintiff.*

October 31, 2017

Court of Appeals Case No.
19A01-1607-CT-1743

Appeal from the Dubois Circuit
Court

The Honorable Nathan A.
Verkamp, Judge

Trial Court Cause No.
19C01-1408-CT-476

**Brown, Judge.**

[1] This interlocutory appeal involves a subrogation action that arose from a property insurance claim made by Southwest Dubois County School Corporation ("Southwest") with its insurer, Hanover Insurance Company ("Hanover"), in connection with damage which occurred during a multi-phase construction and renovation project to a high school that Southwest owns and operates. The claim was settled, and Hanover, as subrogee for Southwest, brought an action against two subcontractors who worked on the project seeking reimbursement for the insurance claim. The subcontractors, Performance Services, Inc. ("PSI") and Huntingburg Machine Works, Inc. ("Huntingburg"), appeal the trial court's order denying their joint motion for summary judgment. They raise two issues, one of which we find dispositive: whether the trial court erred in denying PSI and Huntingburg's summary judgment motion because Hanover's subrogation rights are waived. We reverse and remand.

### Facts and Procedural History

[2] Southwest owns and operates Southridge High School located in Huntingburg, Indiana. Hanover is the property insurer for the school. In 2009, Southwest decided to undertake a construction and renovation project ("Project") at the school which was to occur in phases. Phase 1A consisted of adding a new auxiliary gym and boiler room to the existing school. Phase 1B was the renovation of the entire school, one section of the school at a time.

[3] On April 1, 2009, Southwest contracted with The Skillman Corporation ("Construction Manager") to serve as the construction manager for the Project and to oversee the renovations and coordinate the activities of contractors that subsequently would be hired to perform the work on the Project. The executed contract between Southwest and the Construction Manager (the "Construction Manager Contract") was comprised of the American Institute of Architects' (AIA) standard form B801™ CMa-1992 titled "Standard Form of Agreement Between Owner and Construction Manager." The Construction Manager Contract incorporated by reference the AIA Document A201/CMa™ General Conditions of the Contract for Construction, Construction-Manager Advisor Edition (the "A201/CMa") which, among other things, defined certain terms not defined in the Construction Manager Contract. The Construction Manager's services were contracted to span a thirty-six month period. The Construction Manager was responsible for reviewing Southwest's construction plan, approving a detailed estimate of probable construction costs, assisting Southwest in achieving a budget for construction costs, reviewing design documents, preparing a project schedule, updating the project schedule, advising on the division of work among contractors, and inspecting the contractors' final work product. The Construction Manager also was responsible for awarding contracts on Southwest's behalf, even though the contracts would be signed by Southwest and the various contractors. Under Section 10.4 of the Construction Manager Contract, Southwest and the Construction Manager agreed to waive all subrogation rights against each other

and all contractors for any damage that might occur during the Project that was covered by property insurance. Appellants' Appendix Volume 2 at 92.

[4] One aspect of the Project included the installation of an energy-efficient heating, ventilation, and air conditioning ("HVAC") replacement system. On July 12, 2010, Southwest contracted with PSI for the purchase and installation of the system (the "PSI Contract"). The PSI Contract did not include a subrogation waiver, and it did not incorporate by reference the Construction Manager Contract. The PSI Contract did include an integration clause, providing: "all previous conversations, correspondence, agreements, or representations not included in the Agreement are not part of the Agreement." *Id*. at 26.

[5] On January 11, 2011, PSI contracted with Huntingburg, as a subcontractor, to complete the piping and sheet metal work for the HVAC replacement system (the "Huntingburg Subcontract"). The Huntingburg Subcontract contained a subrogation-waiver clause that provided that Huntingburg's insurance carriers had "no right of subrogation against" PSI or Southwest "with respect to losses arising out of or in connection with the Work on the Project under the Subcontract," and also included a liability-indemnification provision. *Id*. at 165, 171.

[6] At some point during the construction process, water escaped from an uncapped pipe and flowed through the ceiling of Southridge High School's technology room and onto the school's computer, phone, and intercom

processing equipment. The damage was discovered on September 26, 2011. Southwest reported the loss to Hanover on September 29, 2011. The damages totaled $698,661.71. On August 10, 2012, Hanover settled Southwest's insurance claim for the full amount of the damages. Southwest released Hanover from any further claims related to the property damage. The release was executed on August 6, 2012.

[7] On August 18, 2014, more than two years after the release was executed, Hanover, as Southwest's subrogee, filed suit against PSI and Huntingburg for negligence and to be reimbursed for the insurance claim. PSI and Huntingburg filed a joint motion for summary judgment arguing that Hanover's claims were barred by the waiver of subrogation clause in the Construction Manager Contract. Hanover filed a cross-motion for summary judgment, a hearing was held on the motions, and the trial court denied both summary judgment motions. PSI and Huntingburg timely moved the trial court to certify for interlocutory appeal the denial of their summary judgment motion. The trial court granted their motion and certified the order, and this Court has granted permission to bring the interlocutory appeal.

## Discussion

[8] The issue is whether the trial court erred in denying PSI and Huntingburg's joint summary judgment motion because Hanover's claims are barred by the waiver of subrogation clause found in the Construction Manager Contract. Our standard of review of a summary judgment motion is the same standard used in the trial court:

> [S]ummary judgment is appropriate only where the evidence
> shows there is no genuine issue of material fact and the moving
> party is entitled to judgment as a matter of law. All facts and
> reasonable inferences drawn from those facts are construed in
> favor of the non-moving party. The review of a summary
> judgment motion is limited to those materials designated to the
> trial court.

*Tom-Wat, Inc. v. Fink*, 741 N.E.2d 343, 346 (Ind. 2001) (internal citations omitted). The moving party bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012). Summary judgment is improper if the movant fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* We construe all factual inferences in the nonmoving party's favor and resolve all doubts as to the existence of a material issue against the moving party. *Id.*

[9] PSI and Huntingburg argue that the trial court erred by denying their motion for summary judgment because "the undisputed material facts demonstrate that Hanover's claims against [them] are barred" by the waiver-of-subrogation clause contained in the Construction Manager Contract. Appellants' Brief at 13-14. According to PSI and Huntingburg:

> [W]hen Southwest entered the [PSI Contract], it no longer
> possessed subrogation rights (because Southwest had waived all
> such rights in the [Construction Manager] Contract) . . . .
> Accordingly, Southwest's waiver of subrogation for property
> damage . . . to the extent covered by property insurance, has full

force against Hanover's rights as Southwest's subrogee. . . . Regardless of whether the subsequent [PSI Contract] . . . contained an integration clause, Southwest did not recoup a right [to subrogation] it had already contracted away.

*Id.* at 14, 17, 21. Hanover maintains that the PSI Contract was a "separate and distinct contract executed over 15 months after the [Construction Manager] Contract," and that the PSI Contract, "along with the Huntingburg Subcontract (which incorporates the PSI Contract), are the controlling agreements."[1] Appellee's Brief at 16. It argues that "the PSI Contract does not incorporate the terms of any prior contracts, including the waiver of subrogation in the [Construction Manager Contract]." *Id.* Therefore, according to Hanover, "there simply is no waiver of subrogation that applies to Hanover's claims." *Id.*

[10] Interpretation and construction of contract provisions are questions of law. *Fischer v. Heymann*, 943 N.E.2d 896, 900 (Ind. Ct. App. 2011), *trans. denied*. As such, cases involving contract interpretation are particularly appropriate for summary judgment. *Westfield Cos. v. Knapp*, 804 N.E.2d 1270, 1274 (Ind. Ct. App. 2004), *trans. denied*. We review the contract as a whole, attempting to ascertain the parties' intent and making every attempt to construe the contract's language "so as not to render any words, phrases, or terms ineffective or meaningless." *Fischer,* 943 N.E.2d at 900 (citation omitted). We examine the

---

[1] Hanover asserts that neither the PSI Contract nor the Huntingburg Subcontract contains a waiver of subrogation clause. However, as discussed below, the Huntingburg Subcontract does contain a waiver of subrogation clause. *See* Appellants' Appendix 2 at 165, Article 5.10.

parties' intent at the time the contract was made. *Dave's Excavating, Inc. v. City of New Castle*, 959 N.E.2d 369, 376-377 (Ind. Ct. App. 2012), *trans. denied*.

[11] Where terms of a contract are clear and unambiguous, we will apply the plain and ordinary meaning of the terms and enforce the contract according to its terms. *Claire's Boutiques, Inc. v. Brownsburg Station Partners LLC*, 997 N.E.2d 1093, 1098 (Ind. Ct. App. 2013). If necessary, the text of a disputed provision may be understood by referring to other provisions within the four corners of the document. *Id*. The four corners rule states that where the language of a contract is unambiguous, the parties' intent is to be determined by reviewing the language contained within the "four corners" of the contract, and "parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence." *Adams v. Reinaker,* 808 N.E.2d 192, 196 (Ind. Ct. App. 2004). Extrinsic evidence cannot be used to create an ambiguity. *Id*.

[12] Regarding integration clauses, the Indiana Supreme Court has held that the determination of whether the parties intended a writing to be totally integrated must be based on all the relevant evidence. *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986); *see I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1035 (Ind. Ct. App. 1998), *trans. denied*. An integration clause does not control the question of whether a writing is or was intended to be a completely integrated agreement. *Id*. The weight to be given an integration clause will vary depending on the facts and circumstances of each particular case. *Id*.

[13] A contract may incorporate external documents by reference. *See I.C.C. Protective Coatings,* 695 N.E.2d at 1036 ("Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and, therefore, may properly be considered in the construction of the contract."). Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties. *Id.*

[14] Here, the contracts at issue are the Construction Manager Contract along with the incorporated A201/CMa general conditions, the PSI Contract, and the Huntingburg Subcontract. Article 10.4 of the Construction Manager Contract addresses waivers of subrogation and provides as follows:

> Waivers of Subrogation. [Southwest] and Construction Manager waive all rights against each other and against the Contractors, . . . for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of such insurance as set forth in the [A201/CMa general conditions]. [Southwest] and Construction Manager each shall require similar waivers from their Contractors, Architect, consultants, agents, and persons or entities awarded separate contracts administered under [Southwest's] own forces.

Appellants' Appendix Volume 2 at 92. Article 3 of the A201/CMa addresses the duties of the "Contractor," and Paragraph 3.1.2 of the Article provides that the term "Contractors" in the plural "refers to persons or entities who perform

construction under [the] Conditions of the Contract that are administered by the Construction Manager . . . ." *Id*. at 126. Article 11.3 of the A201/CMa addresses the property insurance Southwest was required to maintain, and Paragraph 11.3.1 of the Article specifically provides:

> Unless otherwise provided, [Southwest] shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis without voluntary deductibles. Such property insurance shall be maintained . . . until final payment has been made . . . or until no person or entity other than [Southwest] has an insurable interest in the property . . . whichever is earlier. This insurance shall include interests of [Southwest], the Contractor, Subcontractors, and Sub-subcontractors in the Work.

*Id*. at 140. Paragraph 11.3.1.1 of the Article states:

> Property insurance shall be on an "all-risk" policy form and shall insure against the perils of fire and extended coverage and physical loss or damage, including . . . theft, vandalism, malicious mischief, collapse, false work, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's services and expenses required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

*Id*. The A201/CMa defines "Work" as follows:

> [T]he construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

*Id.* at 124.

[15] Under the provisions of the PSI Contract, PSI was required to maintain liability insurance in certain minimal amounts. *Id.* at 25. Southwest was to "assume full responsibility for any risk of loss to the Work after it [was] installed and operational." *Id.* PSI was "responsible for risk of loss after the Work [was] installed and operational to the extent that the loss was caused by PSI's negligence or willful misconduct in connection with the performance of the Work." *Id.* The "Work" was to take place during Phase 1A of the Project and included a replacement HVAC system. *Id.* at 27. The contract included an integration clause that reads as follows: "The Agreement, with its attachments and exhibits, is the full Agreement between PSI and [Southwest] . . . . All previous conversations, correspondence, agreements, or representations not included in the Agreement are not part of the Agreement between PSI and [Southwest]." *Id.* at 26.

[16] The Huntingburg Subcontract "concern[ed]" PSI as "Contractor," Huntingburg as "Subcontractor," and Southwest as "Owner." *Id.* at 156. The "Project Description" under the subcontract reads as follows: "Additions and Renovation – Phase 1B Southridge High School and Middle School &

Guaranteed Energy Savings Project." *Id.* The "Project Location" is listed as "Southridge High School." *Id.* Paragraph 1.1 of the subcontract incorporates by reference the PSI Contract. *Id.* at 158. Paragraph 5.10 of the subcontract includes a subrogation-waiver clause that reads as follows:

> The insurance carriers shall have no right of subrogation against [PSI and Southwest] . . . and [Huntingburg] shall obtain from each of its insurers a waiver of subrogation on all insurance coverages required in this Article, including, but not limited to, Commercial General Liability, Workers Compensation, Employer's Liability and Business Auto Liability, in favor of the parties identified herein with respect to losses arising out of or in connection with the Work on the Project under the Subcontract.

*Id.* at 165.

[17] The insurance policy that Hanover issued to Southwest contains a section that allows the insured, Southwest, to waive subrogation rights. The section provides:

> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing . . . . This will not restrict your insurance.

Appellants' Appendix Volume 3 at 86.

[18]    In *Bd. of Comm'rs of Cnty. of Jefferson v. Teton Corp.*, 30 N.E.3d 711, 713 (Ind. 2015), cited by PSI and Huntingburg, Jefferson County awarded the first phase of its courthouse remodeling plan to Teton Corporation, and both parties signed a contract that incorporated a 1987 version of the standard form of the American Institute of Architects ("AIA") contract and the general conditions. The AIA contract contained a broad waiver of subrogation provision for all damages covered by property insurance. A fire destroyed much of the Jefferson County courthouse while the renovation work was being performed, and it was alleged that a roofing subcontractor started the fire while it was soldering downspouts near the wood frame of the building. The fire destroyed both property that was the subject of the construction contract (the work) as well as property that was not subject to the contract (non-work property). Jefferson County's property insurer paid the county for the loss. Jefferson County then filed a subrogation claim (presumably on behalf of its insurance company) against Teton and other subcontractors to recover the loss associated with the non-work. The Indiana Supreme Court found that the subrogation waiver barred Jefferson County's claim and held as follows:

> [T]he plain meaning of the contract defines the scope of the waiver based on the extent and source of *coverage,* not the nature of the *property damaged.* Accordingly, we agree with the majority of jurisdictions that have applied this plain meaning to bar recovery for all damages covered by the same property insurance policy used to cover construction-related damages – commonly referred to as the "any insurance" approach. Because [Teton and the subcontractors] have shown that [Jefferson County's]

insurance covered all damages, the subrogation waiver applies to bar [Jefferson County's] claim.

*Id*. at 712-713.

[19] PSI and Huntingburg also cite cases from other jurisdictions, *Best Friends Pet Care, Inc. v. Design Learned, Inc.*, 77 Conn. App. 167, 823 A.2d 329 (2003), and *Behr v. Hook*, 173 Vt. 122, 787 A.2d 499 (2001), maintaining that "[t]hese courts have expressly held that subrogation-waiver clauses contained in the contract for the project apply to subsequent contracts entered for particular phases of construction, and each subsequent contract need not contain a separate waiver-of-subrogation clause when subrogation has already been broadly waived." Appellants' Brief at 22.

[20] *Best Friends* and *Behr* both addressed whether the waiver-of-subrogation provision in the general construction AIA contract between the owner of the project and the general contractor could still be enforced even though the general contractor failed to obtain subrogation waivers from subcontractors. In *Best Friends*, the Connecticut Court of Appeals held that:

> [T]he failure of [construction manager] to obtain a waiver of subrogation provision from [subcontractor] does not thwart the intent of the parties to the contract. The [trial] court found that the clearly expressed intent of the contract was that parties to the contract waive all subrogation claims against each other and their consultants. Additionally, it found that the absence of a similar agreement between [construction manager and subcontractor] does not obscure that clarity, nor does its absence "affect the validity of the waiver provision in the [AIA contract] between

Best Friends[, owner,] and [construction manager]." We agree with the [trial court].

*Best Friends*, 77 Conn. App. at 180, 823 A.2d at 337 (footnote omitted). In *Behr*, the Vermont Supreme Court noted the general construction AIA contract "[did] not make obtaining the waivers from subcontractors a condition precedent to application of the waiver-of-subrogation provision;" the "plain intent of the parties was to make the [owners'] insurer bear the risk of property damage resulting from fire or other perils;" and, "[b]ecause the waiver-of-subrogation provision required that the waiver be recognized in the insurance policy, the insurer knew the risk when it insured [the owners] and presumably set the rates based on that risk." *Behr*, 171 Vt. at 130-131, 787 A.2d at 505. The court held that "the absence of mutual waivers with respect to the subcontractors was not a material breach affecting the primary purpose of the [subrogation waiver] provision, which was to protect the contractor and its subcontractors from liability for accidental property loss." *Id.* at 131, 787 A.2d at 505-506.

[21] In *South Tippecanoe Sch. Bldg. Corp. v. Shambaugh & Son, Inc.*, 182 Ind. App. 350, 360, 363, 395 N.E.2d 320, 326-328 (1979), another case cited by PSI and Huntingburg, we addressed the issue of waiver of subrogation in the context of an AIA construction contract. In *South Tippecanoe*, the loss occurred during construction. *Id.* at 352-353, 395 N.E.2d at 322. However, we noted that the AIA construction contract indicated an "intent to place any risk of loss on the Work on insurance," and that the "requirement of waivers, . . . [was] consistent with an intent to place the risk of loss on insurance." *Id.* at 360-361, 395

N.E.2d at 326. Moreover, we reasoned that "provisions of Article 11 of the General Conditions reveal a 'studied attempt' by the parties to require construction project risks to be covered by insurance and to 'allocate among the parties the burden of acquiring such insurance.'" *Id*. at 360, 395 N.E.2d at 326. Ultimately, we held that certain parties were intended insureds and could, therefore, enforce the AIA construction contract's waiver of subrogation clause. *Id*. at 362-363, 395 N.E.2d at 327-328.

[22] Property owners and contractors routinely agree to waive subrogation rights for damages. *Teton*, 30 N.E.3d at 712. "The AIA subrogation waiver is well-known in the construction industry and it plays a critical role in the AIA contract's scheme of remedying construction losses through insurance claims, not lawsuits." *Id*. at 715 (citing *American Zurich Ins. Co. v. Barker Roofing, L.P.*, 387 S.W.3d 54 (Tex. Ct. App. 2012)).

[23] Southwest and the Construction Manager entered into the Construction Manager Contract pursuant to which they agreed to waive subrogation rights "against each other and against the Contractors" in the event that damage to property occurred during the Project. Appellants' Appendix Volume 2 at 92. There is no dispute that PSI and Huntingburg constitute "Contractors" under Paragraph 3.1.2 of the A201/CMa. The Construction Manager Contract further required Southwest and the Construction Manager to obtain similar waivers from contractors. *Id*. The language of the Construction Manager Contract supports the conclusion that the intent of the parties was to waive all subrogation claims against contractors and subcontractors. We observe that the

requirement of waivers in the Construction Manager Contract is consistent with an intent to place the risk of loss on insurance, and as the Court noted in *Teton* this is a common practice in the construction industry. We also observe that the Construction Manager Contract did not make obtaining waivers from subcontractors or other contractors a condition precedent to application of the waiver-of-subrogation provision. While the PSI Contract did not include a subrogation-waiver clause, the absence of that mutual waiver is not a material breach affecting the primary purpose of the subrogation-waiver provision to protect the contractors from liability for a loss under these circumstances. We also note that the insurance policy which Hanover issued to Southwest contemplated that Southwest may waive its subrogation rights. Specifically, the insurance policy provided that Southwest "may waive [its subrogation] rights against another party." Appellants' Appendix Volume 3 at 86. When the water damage occurred, Southwest, PSI, and Huntingburg acted according to the waiver-of-subrogation clause found in the Construction Manager Contract, as Southwest sought compensation for its loss from its insurer.

[24] The language of the contracts evidenced an intent of the parties to allocate construction risks to their insurers – a business decision as to who would pay if damage to property occurred during the Project. The total effect of all the contracts was to distribute the risks incidental to the Project to an insurance carrier. The absence of waiver-of-subrogation language and the inclusion of an integration clause in the PSI Contract do not convince us otherwise. The waiver-of-subrogation clause in the Construction Manager Contract waived any

rights of Hanover to seek compensation from PSI and Huntingburg. Based upon the record and the authority discussed above, we conclude that PSI and Hanover are entitled to summary judgment.

## *Conclusion*

For the foregoing reasons, the judgment of the trial court is reversed, and we remand for entry of summary judgment in favor of PSI and Huntingburg.

Reversed and remanded.

May, J., and Pyle, J., concur.